No. 39,091

CARLTON M. JOHNSON, *Appellant,* v. BOEING AIRPLANE COMPANY, *Appellee.*

(262 P. 2d 808)

Opinion filed November 7, 1953.

*F. W. Prosser,* of Wichita, argued the cause, and *L. M. Kagey, Max L. Hamilton* and *Keith Eales,* all of Wichita, were with him on the briefs for the appellant.

*John F. Eberhardt,* of Wichita, argued the cause, and *George Siefkin, George B. Powers, Samuel E. Bartlett, Carl T. Smith, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge* and *Robert M. Siefkin,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: This was an action to recover damages for the alleged invasion of plaintiff's "right of privacy" as a result of the unauthorized publication by defendant company of an advertisement in magazines of nation-wide circulation, and in which such advertisement appeared a photograph of plaintiff.

A demurrer to plaintiff's evidence was sustained and he has appealed.

Briefly stated, the facts are as follows:

During the period from the spring of 1949 until some time in 1951 plaintiff was employed by defendant company as a sheet-metal worker and his duties encompassed nothing other than working in that department. In April, 1950, his assistant foreman asked him if he "would step over and have his picture taken," to which he replied, "Yes." A photographer was present with floodlights and took several pictures of Boeing employees in, on, and around a Boeing B-47 Stratojet Bomber. Plaintiff "posed" for at least two of such photographs, including the one here in controversy. There was no particular reason for plaintiff being singled out as a "model" and any one of the other five hundred employees in the sheet-metal department would have served just as well. He made no inquiries and was not told what use Boeing intended to make of the photographs. Later, however, he discussed the matter with his foreman and the other men in the photographs and they came to the conclusion the pictures might be published in "Plane Talk," a Boeing weekly magazine which was distributed to all Boeing employees. At the time, plaintiff did not know where or how the photographs would be used, and evidenced little or no concern about the matter.

He heard nothing further regarding them until May, 1952, at which time the photograph in question was posted on four Boeing bulletin boards. He had no objection to such use, either at the time or later. In addition, however, in the spring of 1952, it appeared as a part of a Boeing advertisement published in such magazines of

national circulation as "Time," "Newsweek," "United States News," "World Report," and in Air Force magazines. It is conceded that the advertisement was the product of defendant company's advertising department. Plaintiff had no knowledge or information concerning the advertisement prior to its publication, was not consulted concerning it, did not give his permission therefor, and was paid nothing on account of it.

At the time of oral argument of this appeal counsel for defendant furnished the court with copies of the advertisement in question. Inasmuch as we consider the precise form and contents of the advertisement to be highly important in the consideration of the questions involved, an attempt to summarize it generally will be made.

The entire top half of the ad is occupied by a large photograph of a B-47 Stratojet Bomber with two employees working on one wing, one employee working on the afterpart of the fuselage and one checker or observer on the floor looking up at the plane, together with a female employee holding work papers or a pamphlet of some sort. Plaintiff is not shown in this photograph. Beneath this main photograph is the caption:

" 'Mating' the eight-ton B-47 wing with the fuselage."

In the right lower center of the page advertisement is a small photograph—about one-sixth the size of the featured photograph. This smaller photograph is the one in controversy, and shows a section of a Boeing airplane fuselage or wing into which a Boeing employee, the plaintiff, wearing dark masking glasses, is drilling holes with two revolving "wing jigs" or drills. Below this photograph is the following caption:

"The unique Boeing wing jig permits drilling to extremely close tolerances."

It is only fair to state that in both the large and small photographs the airplane and equipment, not the employees, play the "featured role," with the workmen serving the incidental function of "stage props." For instance, in the small photograph, the one in controversy, the emphasis is upon "the unique Boeing wing jig," with no mention being made of the worker (plaintiff) who happens to be holding the two jigs. Nowhere, in either picture, caption, or in the body of the ad, is plaintiff, or any of the other five human "models," mentioned, and neither is there any attempt made to exploit the name, likeness or reputation of the anonymous worker, who happens to be the plaintiff.

The copy accompanying the photographs bears the caption:

### "92 TONS OF WATCHMAKER PRECISION"

and in the lower left-hand corner the ad states:

"For the Air Force, Boeing is building the

B-47 Stratojet, B-50 Superfortress, C-97, Stratofreighter, KC-97 Tanker and the B-52 Stratofortress;

and for the world's leading airlines, Boeing has built fleets of twin-deck Strato-cruisers."

The word "BOEING" appears in large bold type at the lower right-hand corner of the ad. The body of the ad itself reads, in its entirety, as follows:

"In the world's fastest bomber—the B-47 Stratojet—Boeing engineers designed a completely revolutionary airplane. Its 92-ton bulk is composed of 52,000 different parts, each requiring a degree of precision comparable to that of a fine watch. When Boeing men set out to build it in production quantities they had to devise revolutionary methods.

"As one example of their ingenuity, take the wing skin. Thick as the hide of a destroyer, it has to be drilled with 15,000 bolt and rivet holes, each positioned to tolerances as close as half a thousandth of an inch. A specially designed Boeing wing jig does the job.

"Gigantic forgings which form the stiffeners at the wing shoulder must be drilled and machined with such precision that when the wing is 'mated' with the fuselage, the huge assembly slips into place with less than a hair's breadth of clearance. Such accuracy in big aircraft building would have been called 'impossible' a few years ago. Today it is routine.

"From 35 years' experience in aircraft manufacture—and the building of thousands of B-17's and B-29's during World War II—Boeing had the men and the know-how to solve the highly complex manufacturing problems of putting the B-47 Stratojet into full production. These same manufacturing skills have also produced the XB-52 Stratofortress, America's new eight-jet heavy bomber, and have prepared the way for production of an undisclosed number of this great aircraft."

Plaintiff's testimony was to the effect that he had no objection whatever to the picture being taken; that he did not know for what purpose it might be used but that he had an idea it might be published in "Plane Talk," the Boeing magazine; that he was not consulted with reference to its use in an advertisement and was not compensated in any manner for it; that when he first saw the ad he felt "rather proud and complimented"; that later when some of his relatives and friends started teasing and "kidding" him about how much "he got out of it" he felt hurt and disgusted over the fact he had not been paid for its use.

"Q. Why is it you are objecting to that, because you weren't paid for it? A. Just the idea that my friends thought I was paid for it and they thought

I got something out of it and actually I didn't get anything out of it and I thought I should be compensated for them using that picture for advertisement.

"Q. Then really your objection is that Boeing didn't pay you for it before they published it, that is right, isn't it? A. Well, they should have approached me and asked me whether they could use it.

"Q. Had they done so, would you have consented to its use? A. If they had compensated me for it probably I would.

.   .   .   .   .   .       .   .   .   .   .   .

"Q. Well, as a matter of fact, the idea of getting any money out of it didn't originate until your friends kidded you about it, isn't that right? A. Yes, in a way; the way I felt I should be compensated when I first saw the picture because I was proud to see my picture in the Plane Talk but—I mean I don't believe it was ever in Plane Talk for all I know but was on the bulletin boards and I felt that I should be compensated for it at that time but when my friends asked me if I was compensated that made me just wonder about it all the more, whether I should be compensated or not.

"Q. And it made you think when they kidded you about it that you ought to have gotten some money out of it, that is about the story, isn't it? A. That is about the story."

Plaintiff conceded that there was nothing untrue, unfair, or embarrassing, either to him, to the company, or to any of his friends, in the advertisement, and that his name did not appear in it.

Other evidence in behalf of plaintiff was as follows:

One of his friends by the name of Brooks, employed as a cable-splicer's helper by the telephone company, happened to see the ad while glancing through one of the mentioned magazines when he was in the naval service in San Diego, and recognized plaintiff's picture.

"Q. Then when was the next time you saw the plaintiff? A. When he came over to the house after I got home here in September and I started razzing him about it that night.

"Q. You started razzing him about it; what do you mean? A. Oh, calling him glamour boy for getting his pictures in the magazines and that I thought he was getting kind of high class, becoming a model, you might say.

"Q. What did the plaintiff say to that? A. Well, he acted kind of embarrassed; I knew right then I should stop."

Plaintiff's brother had seen the advertisement and recognized plaintiff's picture.

"Q. Did you have any conversation with your brother in connection with his picture in this advertisement? A. I sure did.

"Q. What did you say to him or when was this conversation, I will ask you that? A. Well, I wouldn't recall exactly; it was shortly after he came back from the service and it happened one day I was over at my mother's and I happened to think about it and I up and started joshing him about it. I said,

'My boy, you got your picture published all over the country, it looks like in these magazines,' I said, 'how much loot did you get out of that?'

"Q. What did he say? A. Oh, boy, he said, 'What do you mean "loot"?' he said, 'I didn't get nothing'; I talked to him a little bit longer and seen it was making him kind of aggravated and peeved and everything, kidding him about it, and he just got disgusted with me and kind of walked off in a way and I never said too much more to him about it only when I would rib him after that and he didn't like it."

Another friend of plaintiff's testified that he had noticed the advertisement in several magazines and upon making inquiry plaintiff admitted that it was his picture.

Plaintiff's sister testified that she had seen the advertisement in one of the magazines, recognized her brother's picture, and had discussed the matter with him.

"Q. Was there anything further said in the conversation? A. Well, nothing, only I asked him what they had put it in there for and he said he didn't know, he guessed for advertisement and I said, 'Well, don't they pay you to advertise those things and isn't it the right of a citizen when they have their picture advertised that they should have your permission and that you should be paid for something like this?'

"Q. What did he say? A. He said, well, he guessed so; he didn't know that much about it."

As heretofore stated, defendant's demurrer to plaintiff's evidence on the ground it failed to establish a cause of action was sustained, and judgment was entered in favor of defendant.

The sole question is whether the court erred in so ruling.

The application of the doctrine of "right of privacy," or "the right to be let alone," as it is commonly referred to, has been dealt with extensively by the courts of this country, text-writers and legal publications. Generally speaking, the rule may be said to be as follows, and we quote from 41 Am. Jur., Privacy:

"The right of privacy is concisely defined as the right to be let alone. It has also been defined as the right of a person to be free from unwarranted publicity, and as the right to live without unwarranted interference by the public in matters with which the public is not necessarily concerned. It is apparent that these definitions are couched in the most general terms. Indeed, the diversity of the cases in which the right of privacy has been applied and the relatively undeveloped state of the law on the subject make it difficult or impossible to formulate a precise definition. However, an analysis of the authorities on the subject suggests the following as a fairly comprehensive definition of what constitutes an actionable invasion of the right of privacy: the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to

outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. The right in question is a phase or complement of the right to the security or immunity of one's person, a part of the broad right to 'an inviolate personality.' (§ 2, p. 925.)

". . . While it is clear that when dealing with injuries to feelings alone it is difficult to fix definite and practical limits separating that which is merely a trivial annoyance to a particular individual from that of which the law will take cognizance, the difficulty is not insurmountable. . . . (§ 9, p. 933.)

"The right of privacy is relative to the customs of the time and place, and it is determined by the norm of the ordinary man. The protection afforded by the law to this right must be restricted to 'ordinary sensibilities,' and cannot extend to supersensitiveness or agoraphobia. In order to constitute an invasion of the right of privacy, an act must be of such a nature as a reasonable man can see might and probably would cause mental distress and injury to anyone possessed of ordinary feelings and intelligence, situated in like circumstances as the complainant; and this question is to some extent one of law." (§ 12, pp. 934 and 935.)

Apparently the only Kansas decision dealing with the subject is the case of *Kunz v. Allen,* 102 Kan. 883, 172 Pac. 532, L. R. A. 1918D, 1151, decided in 1918. In that case, while plaintiff was shopping in defendants' drygoods store, the latter, without her knowledge, caused moving-picture films to be taken of her face, form, and garments, and afterwards procured the films to be developed, enlarged, and used to advertise their business by public exhibition in a moving-picture theater in the neighborhood where plaintiff lived. In her action for damages she alleged that by reason of the foregoing she became the common talk of the people in the community, it being understood and believed among them generally that she had, for hire, permitted her picture to be taken and used as a public advertisement. Defendants' answer was a general denial. On the trial of the action the court sustained a demurrer to plaintiff's evidence on the ground she had failed to prove any actual damages. On appeal, this court reversed, and in the opinion quoted with approval from decisions of other jurisdictions to the effect that in such an action recovery may be had without proof of special damage. From an examination of the authorities it appears that this is the general rule.

We do not consider it necessary or expedient, in order to reach a correct decision in the case at bar, to encumber this opinion with an extended discussion and review of the application of the doctrine of "right of privacy" found in the many decisions from other jurisdictions, most of which are cited and digested in the following au-

thorities: 41 Am. Jur., Privacy, p. 923; 77 C. J. S., Right of Privacy, p. 396; and Annotations found at 138 A. L..R. 22; 168 A. L. R. 446, and 14 A. L. R. 2d, 750. See also the article in May, 1953, issue of The Journal of the Bar Association of the State of Kansas at page 381.

Resort to the cases discloses numerous and varying circumstances under which liability has been allowed or denied, and from them it is clear that inherent in the rule is an elasticity which must take into account the particular circumstances of each case.

What, then, are the facts of the case before us? For one thing, we think they show clearly that plaintiff, impliedly at least, con-sented to the publication of his photograph.

"Q. And you thought that picture was to go in Plane Talk? A. Not especially; I didn't know where it was going.

"Q. Well, in any event, you had no objection to it going in Plane Talk, did you? A. No, I didn't."

It seems clear that plaintiff's admission to the effect he did not know "where it was going," and his subsequent speculation that it "might" be published in Plane Talk, is proof that when he "posed" for the photograph he was fully aware that it would be published by Boeing. He made no objection to its publication, and neither did he suggest or prescribe any restrictions upon its use. The evidence does not show even the slightest suggestion of any coercion, intimidation, or veiled threat or demand at any time on the part of defendant company. Under plaintiff's own testimony, and all of the surrounding facts and circumstances, it is clear that he knew the photograph would be published somewhere.

"The right of privacy, like other rights that rest in an individual, may be waived by him. A waiver or relinquishment of this right, or of some aspect thereof, may be implied from the conduct of the parties and the surrounding circumstances. . . ." (41 Am. Jur., Privacy, § 17, p. 937.)

And there is still another reason why we think plaintiff's own testimony and the other evidence introduced in his behalf preclude his recovery. Aside from the fact he impliedly consented to the publication of the photograph in question, he admitted that insofar as the picture itself was concerned he felt proud and complimented about it, due, undoubtedly, to the fact he appeared as a skilled worker performing a highly technical and intricate job in the construction of the airplane. It is true that the advertisement was run by defendant company to advertise and publicize its business, but,

as heretofore pointed out, the ad itself, including the photograph, exploits and calls attention to the airplane and manufacturing equipment, and not to plaintiff or his fellow workmen. The reader's attention is directed to the drilling equipment, and not to plaintiff, who merely happens to be the unnamed, unidentified and anonymous workman operating the equipment. Plaintiff's evidence clearly discloses that he was not hurt, embarrassed, humiliated, aggravated, or in any way "put out," due to the publication of the advertisement. His subsequent "feeling" in the matter arose when, after being "kidded" by a few of his friends and relatives, he concluded that he should have been compensated. It is clear that his subsequent irritation was the result of his not being compensated, rather than because of the publication of the advertisement, and that the entire matter was an "afterthought" on his part. To permit recovery under these facts would expand the doctrine of privacy beyond all logical reasoning and stretch it almost to the point of absurdity.

The distinctions between the facts of this case and those of the Kunz case, *supra*, are too obvious to require elaboration and discussion.

Finally, it is argued by plaintiff that from the oral remarks of the trial judge when the demurrer was sustained, it is evident the court based its ruling upon an erroneous premise. Conceding, for the sake of argument, that the trial court was in error in some of its reasoning, nevertheless, the question before this court is whether the judgment itself is correct, and not whether the grounds upon which it professes to proceed are tenable. (*Foster v. City of Augusta,* 174 Kan. 324, 256 P. 2d 121.) It has been held many times that if a judgment itself is correct it will not be set aside merely because of erroneous reasoning in arriving at it.

The demurrer was properly sustained and the judgment is affirmed.