No. 47,561

Floyd Dotson and Security State Bank, a Corporation, *Appellants and Cross-Appellees*, v. Harold McLaughlin and Norma Jean McLaughlin, His Wife, d/b/a White Grill, *Appellees and Cross-Appellants*.

(531 P. 2d 1)

Opinion filed January 25, 1975.

*Thomas G. Teichgraeber,* of Wheeler, Mitchelson and Rhodes, of Pittsburg, argued the cause, and was on the brief for the appellant and cross-appellee, Floyd Dotson.

*Walter B. Patterson,* of Fort Scott, argued the cause, and was on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

PRAGER, J.: This appeal involves a claimed violation of the right of privacy. Various other claims and counterclaims of the parties have been determined either by settlement or by jury verdict. This is the final chapter of prolonged, complicated litigation that began in 1967. The original appellants in this case were the Security State Bank of Fort Scott, Kansas, and its president, Floyd Dotson. The appellees are Harold McLaughlin and his wife, Norma Jean McLaughlin. Most of the facts in this case are not in dispute and

are essentially as follows: Prior to March 1966 the appellee, Harold McLaughlin, owned and operated four White Grill Restaurants at Nevada, Missouri, and at Chanute, Fort Scott and Pittsburg, Kansas. McLaughlin had secured a $60,000 loan from the Small Business Administration in 1963 for the construction of the Chanute restaurant. Subsequent thereto he obtained a second SBA loan in the amount of $20,000. The Security State Bank had a ten percent interest in the first loan and a twenty percent interest in the second loan. The SBA loans were apparently subject to a first deed of trust held by a creditor of McLaughlin in the state of Missouri. In March of 1966 the employees of the Small Business Administration believed that its loans to McLaughlin were in danger and that the White Grill restaurants were in financial difficulties. The record is undisputed that the holder of the first deed of trust was threatening to foreclose its security. At that time McLaughlin owed approximately $13,000 to $14,000 on restaurant open accounts and it is undisputed that McLaughlin had written a number of insufficient fund checks in payment of business obligations. McLaughlin had written among others an insufficient fund check to the Internal Revenue Service in order to cover his taxes. It was necessary for McLaughlin to go around to each of his four restaurants to make that check good from cash on hand. He did not have sufficient money in any of his business bank accounts to pay the check. McLaughlin testified, however, that he did not think that at the time he was in any severe financial straits.

About April 1, 1966, at the request of the SBA, McLaughlin met with two SBA officials and Dotson at the bank. The SBA officials expressed their concern over McLaughlin's financial affairs and the status of the SBA loans. They discussed the management of the four White Grill restaurants. Dotson suggested that the financial control of the four restaurants should be taken over by himself acting for the bank. It was proposed that there be established four different accounts in the Security State Bank in which all receipts from the four restaurants would be deposited and from which all obligations of the four restaurants would be paid. Dotson also suggested that McLaughlin sell his Cadillac, which was heavily mortgaged, and personally manage the restaurant at Chanute. McLaughlin did not immediately consent to this arrangement. A few days later Dotson again called McLaughlin to the bank. According to Dotson at that time McLaughlin consented to having

Dotson take over the running of the financial affairs of the restaurants and McLaughlin also agreed to sell his Cadillac. McLaughlin testified that he was advised by Dotson that if he did not agree to this arrangement, the SBA loans would be foreclosed and he would be out of business. McLaughlin testified he thought that he did not have any alternative but to agree to this procedure since he presumed that the bank could foreclose its loan if he refused to go along. Dotson took over the handling of the financial affairs of the four restaurants on April 12, 1966, and continued to handle them until May 10, 1967, a period of 13 months. It should be noted that McLaughlin brought all of the books of his businesses to the bank and thereafter did deliver to Dotson all of the receipts from his restaurants and also all of the bills. Dotson got in touch with McLaughlin's creditors, advised them of the arrangement, and stated that current bills would be paid along with pro rata payments on older obligations. All in all, it was a very unsatisfactory arrangement to Harold McLaughlin and his wife, Norma Jean McLaughlin, whom Harold married during this period. During the period Dotson was in charge of the financial affairs of the four restaurants, the restaurant at Nevada was sold as was also McLaughlin's residential property in that city. The proceeds of these sales were placed in the bank accounts and used to pay McLaughlin's debts. Prior to relinquishing control of the three remaining businesses back to McLaughlin, Dotson obtained from Mr. and Mrs. McLaughlin their signatures on a release which stated that the bank and Dotson were fully released from liability arising from Dotson's handling of the restaurants' financial transactions.

The present litigation was provoked when an action was filed by Omaha Steaks International, Inc. against Harold Dotson and the Security State Bank to recover for food and restaurant supplies sold and delivered to the restaurants between December 27, 1965, and May 16, 1967. Both Dotson and the bank filed in addition to an answer a third-party petition against McLaughlin. The substance of the third-party petition against McLaughlin was that McLaughlin had purchased the goods from Omaha Steaks and that if there was anything due Omaha Steaks on that account, it was the obligation of McLaughlin and not of Dotson or of the bank. McLaughlin filed his answer to the third-party petition in which he pleaded that the bill for the merchandise claimed by plaintiff was

the obligation of the bank and Dotson. In addition he filed a counterclaim in which he alleged that Dotson and the bank had forcibly and illegally taken possession of his four restaurants, that Dotson and the bank had mismanaged his financial affairs, and furthermore that they had caused McLaughlin to suffer mental anguish, pain and physical disability. McLaughlin sought to recover compensatory damages in the amount of $15,000 and punitive damages in the amount of $15,000. Furthermore he prayed for a complete and full accounting from Dotson and the bank in the handling of the finances of McLaughlin's restaurants. The case became even more complicated when the Security State Bank filed a reply to the counterclaim of the third-party defendant McLaughlin claiming the right to recover on a note executed to the bank by Harold A. and Norma Jean McLaughlin in May of 1967 when the handling of the financial affairs of the restaurants was turned back over to the McLaughlins.

Some time later Omaha Steaks International, Inc. dismissed its petition and dropped out of the litigation. The record does not show whether this claim was paid or how the dismissal came about. On March 25, 1968, a pretrial conference was held in the case. On September 18, 1968, an additional pretrial conference was had with reference to the various claims of the Security State Bank, Dotson and McLaughlin. The issues of fact were stated to be as follows:

(1) The manner in which Dotson and the bank took over the handling of the McLaughlin accounts.

(2) Whether or not there was an unlawful and illegal taking over of McLaughlin's business.

(3) Whether or not as a result of a proposed accounting McLaughlin is entitled to recover from Dotson and the bank.

(4) The extent of McLaughlin's damages, if any.

(5) Whether or not the McLaughlins had executed a valid release discharging Dotson and the bank from liability.

(6) Whether or not the note executed by the McLaughlins to the bank is an existing obligation because it was obtained by duress.

A number of difficult legal questions were also raised concerning the statute of frauds, the validity of the release, whether or not the bank was operating a business in violation of the banking statutes, and whether any acts by the bank and Dotson were malicious and wilful so as to permit recovery of punitive damages. It should be noted that there was no reference in the pretrial order as to any violation of McLaughlin's right of privacy.

On May 25, 1970, the parties filed a document entitled "Designation of Issues by Plaintiff and Third Party Defendants". In this document it was claimed by McLaughlin that Dotson drew insufficient fund checks on the restaurant accounts and made unauthorized disbursements. It was again asserted that the release signed by the McLaughlins had been obtained by fraud, misrepresentation and duress and that the release was unconscionable. Also for the first time it was claimed that Dotson and the bank had invaded McLauhglin's *right of privacy* causing him disgrace, humiliation, mental pain and anguish, and physical disability, and that such acts were wilful, wanton and malicious, by reason of which McLaughlin is entitled to punitive damages. It was about at this time that the petition of Omaha Steaks International, Inc. was dismissed on its own motion.

The case was finally tried to a jury in January of 1973, more than five years after the case was originally filed. The case was submitted to the jury on the various theories discussed above including the misappropriation of restaurant funds by Dotson and the bank, breach of contract, fraud, duress, the right of McLaughlin to an accounting, violation of the right of privacy, punitive damages, and the claim of the Security State Bank against the McLaughlins on McLaughlins' note and mortgage. Suffice it to say it was a difficult case for the court, counsel and the jury. The case was submitted on four specific questions which were answered by the jury as follows: The jury found that the Security State Bank was entitled to recover on its note and mortgage from the McLaughlins in the principal sum of $3,982 with interest. As to McLaughlin's claim for an accounting for the mishandling of the financial affairs of the restaurants, the jury found that the McLaughlins were entitled to recover nothing. The jury found that Harold McLaughlin was entitled to recover on his claim of invasion of privacy in the amount of $8,000 and the further sum of $8,000 as punitive damages. After postjudgment motions were overruled, all parties appealed.

In November 1973 a joint motion to dismiss their appeals was filed by the Security State Bank and the McLaughlins based upon an agreed settlement. The appeals of the bank and McLaughlin were dismissed. This left the appeal of the appellant, Floyd Dotson, as the only appeal pending in this court for determination. Dotson's appeal involves only the propriety of the judgment entered against him for $8,000 for the alleged violation of McLaughlin's right of privacy and $8,000 for punitive damages. It is important to take

note of the fact that with the exception of the right of privacy issue all other claims in the case have been fully adjudicated between the parties. These include McLaughlin's right to an accounting from Dotson for the way he handled the restaurants' financial affairs and the claim of the Security State Bank against McLaughlins on their note and mortgage executed just prior to the time the restaurant businesses were turned back over to the McLaughlins. There are a number of points raised on this appeal. The major issue confronting this court is whether the evidence presented at the trial was sufficient to establish a submissible case of invasion of privacy for which the jury might award damages. We will determine this case on that single point, and hence it will not be necessary to determine the other points raised by the appellant Dotson.

At an early date Kansas recognized invasion of the right of privacy as a tort upon which a cause of action could be based. (*Kunz v. Allen,* 102 Kan. 883, 172 Pac. 532 [1918].) *Kunz* involved the unauthorized exhibition of a photograph of a person taken without her consent and for the purpose of exploiting the publisher's business. Our next right of privacy case was in 1953 when we decided *Johnson v. Boeing Airplane Co.,* 175 Kan. 275, 262 P. 2d 808. *Johnson* involved an alleged invasion of plaintiff's right of privacy by the unauthorized publication of plaintiff's photograph by the Boeing Airplane Company in business advertisements in certain national magazines. We again recognized the existence of the right of privacy but held that under the factual circumstances the plaintiff had waived his right by consenting to the use of his photograph by the company. In the syllabus we defined the right of privacy as follows:

"The doctrine of the 'right of privacy' is defined as 'the right to be let alone,' the right to be free from unwarranted publicity, the right to live without unwarranted interference by the public in matters with which the public is not necessarily or legitimately concerned, and the right to be free from unwarranted appropriation or exploitation of one's personality, private affairs and private activities." (Syl. ¶ 1.)

The right of privacy was before the court in *Munsell v. Ideal Food Stores,* 208 Kan. 909, 494 P. 2d 1063. There we held that only *unwarranted* invasions of the right of privacy are actionable and that the right of privacy does not prohibit the communication of any matter though of a private nature, when the publication is made under circumstances which would render it a privileged communication according to the law of libel and slander.

Professor William L. Prosser in his Law of Torts, 4th Ed.,

Privacy, § 117, discusses in depth the origin and development of the right of privacy. He points out the difficulties the courts have had in fixing the boundaries for its recognition. One federal judge described the state of the law on the right to privacy as that of a haystack in a hurricane. (*Ettore v. Philco Television Broadcasting Corporation,* 229 F. 2d 481.) Professor Prosser analyzed all of the cases on the subject and concluded that the law of privacy comprises four distinct kinds of torts which are tied together by the common name, but otherwise have almost nothing in common except that each protects against interference with the right of the plaintiff "to be let alone." The Restatement of the Law, Second, Torts (Tentative Draft 13) § 652 adopted Prosser's four-pronged concept of the right of privacy. In *Froelich v. Adair,* 213 Kan. 357, 516 P. 2d 993, Mr. Justice Owsley discussed the right of privacy in a case involving the unauthorized invasion of the plaintiff's hospital room for the purpose of obtaining hair samples from the plaintiff's hair brush. *Froelich* is important in this jurisdiction because it brought the right to privacy into sharper focus and gave recognition to the analysis of the right of privacy as made by Prosser and the Restatement of the Law, Second, Torts.

The Restatement of the Law, Second, Torts § 652, provides as follows:

"§ 652A. *MEANING OF INVASION OF PRIVACY*

"THE RIGHT OF PRIVACY IS INVADED WHEN THERE IS

"(*a*) UNREASONABLE INTRUSION UPON THE SECLUSION OF ANOTHER, AS STATED IN § 652B; OR

"(*b*) APPROPRIATION OF THE OTHER'S NAME OR LIKENESS AS STATED IN § 652C; OR

"(*c*) UNREASONABLE PUBLICITY GIVEN TO THE OTHER'S PRIVATE LIFE, AS STATED IN § 652D; OR

"(*d*) PUBLICITY WHICH UNREASONABLY PLACES THE OTHER IN A FALSE LICHT BEFORE THE PUBLIC, AS STATED IN § 652E."

"§ 652B. *INTRUSION UPON SECLUSION*

"One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man." (p. 103.)

"§ 652C. *APPROPRIATION OF NAME OR LIKENESS*

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." (p. 108.)

"§ 652D. *PUBLICITY GIVEN TO PRIVATE LIFE*

"One who gives publicity to matters concerning the private life of

another, of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." (p. 113.)

"§ 652E. *PUBLICITY PLACING PERSON IN FALSE LIGHT*

"One who gives to another publicity which places him before the public in a false light of a kind highly offensive to a reasonable man, is subject to liability to the other for invasion of his privacy." (p. 120.)

We believe that the analysis of the right of privacy as contained in the Restatement, Second, Torts § 652, is sound and that the courts of this state should follow it in fixing the boundaries for its protection.

We should now turn to the evidentiary record before us to determine whether or not a claim for invasion of the right of privacy has been made out under any of the four categories discussed above. There is a real problem presented in this case when one seeks to understand just what counsel for McLaughlin meant in making a claim for invasion of privacy and in just what manner it came to be made. As pointed out above the right of privacy is not mentioned in the pleadings or in the two pretrial orders filed in the case. The right of privacy is first mentioned in the "Designation of Issues by Plaintiff and Third Party Defendants" filed on May 25, 1970. Exactly how the right of privacy of McLaughlin was invaded is not set forth with particularity. In the brief filed by the McLaughlins in this court, counsel points out that the counterclaim states in substance that Dotson and the bank illegally, unlawfully and forcibly took over the operation of McLaughlin's restaurant businesses and interfered in their operation. He further argues that Dotson mishandled the business funds which came into his hands. There is some testimony in the record by McLaughlin that Dotson called him by telephone every day in regard to the financial operations of the company and that this resulted in McLaughlin's inability to sleep and caused him to develop high blood pressure. He testified that he was humiliated, worried crazy, and harassed and finally at age 62 took his social security because he was unable to work as he formerly did 10 to 12 hours a day.

We have concluded that on the basis of the record before us McLaughlin has failed as a matter of law to establish an invasion of his right of privacy. It seems obvious to us that we do not have involved here the appropriation of McLaughlin's name or likeness (§ 652C) or unreasonable publicity given to McLaughlin's private life (§ 652D) or publicity which unreasonably placed McLaughlin in a false light before the public (§ 652E). If an invasion of privacy is to be made out from the evidence, it, of necessity, must be based

upon some unreasonable intrusion upon McLaughlin's seclusion as defined in Restatement, Second, Torts, § 652B. In our judgment McLaughlin has not made out a case for violation of his right to privacy under that theory. There is no evidence whatsoever to show physical intrustion into a private place which McLaughlin had secured for himself or any type of act in the nature of a prying or intrusion into any private or secured area of McLaughlin's life. Any interference here by Dotson and the bank was in the area of McLaughlin's business interests, not in the area of his private affairs. The wrongful taking over of the financial assets of a business by a creditor may constitute a conversion of property but it does not in itself constitute a violation of the right of privacy of the debtor. Hence we have concluded that it was error for the trial court to submit this case to the jury on the theory of violation of McLaughlin's right of privacy.

The failure of McLaughlin to establish a case of invasion of his right of privacy does not necessarily mean, however, that he is without remedy for abusive acts committed by his creditor. There is another theory in tort closely allied to invasion of the right of privacy which protects a debtor from outrageous conduct on the part of his creditor. In *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P. 2d 104, we held that a creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm. In so holding we recognized and applied Restatement, Second, Torts § 46 (1) which provides as follows:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

It should be noted that a cause of action based upon outrageous conduct of a creditor against a debtor is not included under § 652 governing invasion of the right of privacy but is recognized as a completely independent tort. It has been referred to in recent years as the tort of "outrage." In *Dawson* we adopted the rule of Restatement, Second, Torts § 46 (1) in cases involving debtor harassment. We pointed out in the opinion that the right of a debtor to be left alone is qualified by the rights of others. When one accepts credit, the debtor impliedly consents for the creditor to take reason-

able steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt. Furthermore in *Dawson* we emphasized that in this area of the developing law, the business community must be given some latitude to pursue reasonable methods of collecting debts even though such methods often might result in some inconvenience or embarrassment to the debtor. Debtors' tender sensibilities are protected only from oppressive, outrageous conduct.

Comment *d* under § 46 of the Restatement, Second, Torts, restricts a right of action under that section to extreme and outrageous conduct. Comment *d* states:

"The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. . . ." (p. 73.)

In paragraph *f* of the comment it is noted that the extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. In *Dawson* we held that the factual circumstances were sufficient to raise a jury question of outrageous conduct causing severe emotional distress by a creditor by virtue of the fact that the defendant creditor knew that its debtor, the plaintiff, was suffering from multiple sclerosis and would be peculiarly susceptible to emotional distress because of that disease. There were also other circumstances present in that case which are not present here.

In *Dawson* we further pointed out that under comment *h*, § 46

(1), of the Restatement, Second, Torts, it is for the court to determine in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so, and where reasonable men may differ, the question is for the jury to determine. We have carefully examined the evidentiary record in this case and we have concluded that as a matter of law the conduct of Dotson and the bank was not sufficiently extreme or outrageous to justify liability to McLaughlin on the theory of debtor harassment. Here it was undisputed in the evidence that McLaughlin was indebted to the bank and to the Small Business Administration and that the SBA officials were concerned over McLaughlin's financial affairs and the status of the SBA loans. When Dotson insisted, McLaughlin turned over his books to Dotson and then proceeded to deliver all of the receipts from his restaurants and also all of the bills. The mere fact that Dotson telephoned McLaughlin frequently about the financial affairs of the restaurants is not sufficient in itself to establish extreme or outrageous conduct on the part of Dotson. There is nothing in the record to show that abusive language was used by Dotson in these telephone calls. Nor do we regard any statements made by Dotson that the SBA loans would be foreclosed if McLaughlin did not cooperate as sufficiently extreme or outrageous to give rise to liability under the theory of debtor harassment. Stated in another way we cannot say the conduct of Dotson was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. We have concluded that the case should not have been submitted to the jury on the theory of debtor harassment.

In view of the fact that we are setting aside McLaughlin's judgment based upon an alleged invasion of his right of privacy, we must, of necessity, set aside the verdict awarded by the jury in the amount of $8,000 for punitive damages. Before exemplary damages may be awarded, the party claiming damages must establish actual damages and the right to recover therefor. (*Reeder v. Guaranteed Foods, Inc.*, 194 Kan. 386, 399 P. 2d 822.) The jury by its special verdict found that neither Dotson nor the bank owed McLaughlin anything under his claim that Dotson had mishandled the financial affairs of his restaurants and misappropriated his funds.

The conclusions which we have reached are decisive of this

appeal. Under the circumstances we will not consider the other points raised by the appellant Dotson. The costs of this appeal are taxed to the appellee, Harold McLaughlin. The judgment of the district court is reversed, the judgment awarded in the district court to McLaughlin against Floyd Dotson is set aside, and judgment is hereby entered in favor of Dotson on McLaughlin's counterclaim.

OWSLEY, J., not participating.