**Frieda MAI, Plaintiff,**

v.

**WILLIAMS INDUSTRIES, INC., Frank E. Williams, Jr. and Frank Duval, Defendants.**

**No. 93–4171–RDR.**

United States District Court, D. Kansas.

Sept. 11, 1995.

Robert S. Jones, Norton, Wasserman, Jones & Kelly, Salina, KS, Lee C. Davis, Warren N. Sams, III, Melissa S. Harben, Craig A. Courville, Griffin, Cochrane & Mar-

shall, Atlanta, GA, for PKM Steele Service, Inc.

Robert S. Jones, Norton, Wasserman, Jones & Kelly, Salina, KS, Lee C. Davis, Warren N. Sams, III, Melissa S. Harben, Craig A. Courville, Harry L. Griffin, Griffin, Cochrane & Marshall, Atlanta, GA, for Frieda J. Mai.

Lawton M. Nuss, Steven W. Brown, Clark, Mize & Linville, Chtd., Salina, KS, Philip C. Jones, Falls Church, VA, for John F. Beasley Construction Company.

Steven W. Brown, Clark, Mize & Linville, Chtd., Salina, KS, Keith Witten, Bernard L. Balkin, Michael J. Blake, Sandler, Balkin, Hellman & Weinstein, Kansas City, MO, for Indiana Lumbermens Mutual Insurance.

Lawton M. Nuss, Steven W. Brown, Clark, Mize & Linville, Chtd., Salina, KS, Keith Witten, Sandler, Balkin, Hellman & Weinstein, Kansas City, MO, Philip C. Jones, Falls Church, VA, for Frank E. Williams, Jr., Frank Duval, Williams Industries, Inc.

Keith Witten, Sandler, Balkin, Hellman & Weinstein, Kansas City, MO, for National American Insurance Company.

Lawton M. Nuss, Clark, Mize & Linville, Chtd., Salina, KS, for PKM Steele Service, Inc.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This case is now before the court upon the motions for summary judgment by defendants Frank E. Williams, Jr., Frank Duval and Williams Industries, Inc. Prior to the motions for summary judgment, plaintiff had asserted claims alleging the tort of outrage and breach of the Federal Communications Act, 47 U.S.C. § 223. Plaintiff has now withdrawn any claim under the Federal Communications Act. Therefore, the issue before the court is whether summary judgment should be granted against plaintiff's sole remaining claim of outrage.[1] In connection with the instant summary judgment motions, the court shall grant plaintiff's motion for leave to file a surreply to defendants' reply to

1. Other claims or counterclaims raised in this case were transferred by this court to the District of Colorado for disposition and apparently have been settled.

plaintiff's response to defendants' motions for summary judgment. Doc. No. 120. The court shall also consider moot plaintiff's objections to evidence presented in the motions for summary judgment. Doc. No. 113. The court has not relied upon the evidence to which plaintiff objects in making a ruling upon the motions at bar.

## SUMMARY JUDGMENT STANDARDS

■ The general guidelines for analyzing summary judgment motions were reviewed by the Tenth Circuit in *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993):

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). To sustain this burden, the non-moving party cannot rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Applied Genetics Int'l v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

## UNCONTROVERTED FACTS

Plaintiff is the president of PKM Steel Service, Inc. ("PKM"), a steel fabricating company based in Salina, Kansas. Plaintiff earned $194,770.00 in 1992 and $125,794.00 in 1993. The net worth of PKM, which is wholly owned by plaintiff, increased from $2,278,-598.00 to $2,559,726.00 between fiscal year 1992 and fiscal year 1993. PKM was a subcontractor for the construction of the Denver International Airport. John F. Beasley Construction Company ("Beasley") is a steel erection company based in Dallas, Texas. Beasley was a subsubcontractor to PKM on the airport project. Beasley is a wholly-owned subsidiary company of defendant Williams Industries, Inc., which is based in Falls Church, Virginia. Defendant Frank E. Williams, Jr. is the chairman and chief executive officer of Beasley and the chairman and president of Williams Industries, Inc. Defendant Frank DuVal, at the relevant times in this case, was the manager of collections for Williams Industries, Inc. His job was to assist in the collection of receivables for the subsidiary companies.

In the late spring and early summer of 1993, there was a bona fide dispute between PKM, Beasley, and M.A. Mortenson Company ("Mortenson"), a general contractor on the airport project, regarding payment and performance. The parties to this case have stipulated that the dispute was legitimate. The details of the dispute are largely absent from the summary judgment record. Many meetings were conducted and correspondence was exchanged among the companies. As of early July 1993, Beasley was in default to its vendors, in default to its union on benefits due, unable to meet its labor payroll, and on the verge of defaulting on its subcontracts on the airport project. Mortenson had cut a joint payee check for $275,000.00 to PKM and Beasley. Defendants wanted plaintiff, as president of PKM, to endorse the check so that Beasley could have the funds. Plaintiff refused for reasons which the court assumes were bona fide. Plaintiff's outrage claim arises from defendants' efforts to change plaintiff's mind.

Frank DuVal traveled to Salina, Kansas and stayed there from June 29 through July 9, 1993. DuVal met with plaintiff and a colleague of plaintiff's on July 5, 1993. Plaintiff's notes from the meeting stated:

Meeting with Frank DuVal

Frank still contends that Mortenson is ready to release some money to PKM and that Mortenson believes the money should go to Beasley.

One point was that Beasley will sue PKM in Salina, Ks. and that it will stay in Salina, Ks.

Main point was that Beasley will keep PKM from getting any more money from Mortenson or Hensel Phelps until Beasley is paid contract amounts and additional work amounts.

Frank had a piece of scratch paper in his front pocket that had my home address and direction on how to get there. When confronted, he kept silent.

He was asked what he was doing here in Salina, no response.

He mentioned that there was a pattern by PKM with regard to Molnick's and Ridge. If PKM's intension (sic) was to file Chapter 11 and start over again, that is what lies ahead.

Frank also made references to the Hangar project and the delays there.

We still do not have a committment (sic) that Beasley will sign the Lien Releases.

Beasley has still not provided any of their surveys or as built schedules as requested by PKM.

Beasley see (sic) no benefit to them to negotiate, they are better off suing now instead of later.

Beasley will only admit their faults in court.

Beasley is relying on the correspondance (sic) and job files as their claim. ???

Plaintiff's company had been informed previously on June 7, 1993 that Beasley had retained counsel in connection with potential litigation against PKM.

On July 7, 1993, DuVal faxed plaintiff a letter which stated in pertinent part:

As I told you and Mr. Hartsuff, on both Friday and Monday, this week will offer us an opportunity to settle enough differences between our two companies that we can negotiate outstanding issues with some breathing room. If, however, you choose to use the withholding of payment as a tool in our negotiations, then Beasley's long-term interests would be better served through litigation.

To come back to the situation at hand, I believe Mortenson is unequivocally willing to release a substantial payment this week, primarily because Mortenson understands that Beasley is willing to go to court and able to prove, by testimony and documentation, that Beasley has been wrongfully harmed by some party's refusal to release payment. Mortenson does not want to be that "some party." Apparently, someone at Mortenson understands that, when an executive barbarian like Frank Williams decides he's being snookered by lightweights, something's got to give, and quickly.

For some time now, you've been telling us that Mortenson's refusal to release payment is the principal obstacle to further payments from PKM to Beasley. For a while, John and Jeff and I accepted this reasoning and worked on a concentrated effort to secure payment from Mortenson, while negotiating PKM/Beasley issues with Kurtis Sjogren. Strangely enough, our negotiations with Mortenson were more successful than our negotiations with PKM.

Frieda, I can no longer accept your problems with Mortenson as an excuse for failing to settle the back charges, for the following reasons:

1) One of Mortenson's prime weapons has been the Resident Engineer's decision to withhold $100,000 for PKM's failure to provide the survey specified in your subcontract with Mortenson.... Whatever erection problems there may be—and we can only guess at this point—could have been avoided in a routine and inexpensive manner, if only PKM had done its job in a timely fashion.

2) I just don't see that PKM is challenging Mortenson's right to withhold such a large amount of money. Beasley has had to fight PKM's battles, and this is an awkward and expensive way to do business.... PKM's contractual obligations, to both Mortenson and Beasley, involve a lot more than punching holes and shipping

steel. Part of PKM's managerial responsibility is to account for the work that has been done and to facilitate proper payment for that work. I believe the job documents—and lack of job documents—will show that PKM has been negligent in this area, and, further, that Beasley rather than PKM has suffered for this negligence.

3) Let me point out also that there are many invoices, from Beasley to PKM, for which Mortenson will never offer any compensation. I refer to those instances where Beasley performed extra work to compensate for problems caused by PKM.... It is now clear that PKM does not intend to pay Beasley for any of the extra work performed on this project until some undetermined time in the future, and then only to the extent that PKM is satisfied with its settlement with Mortenson.... That is not only unfair; it is sufficiently detrimental to Beasley's financial welfare to warrant serious countermeasures.

Frieda, on Monday you asked me why I was in Salina. The reason, and this should go without saying, is that PKM doesn't pay its bills. Once again, I urge you to use this week as an opportunity to set things right with your erector and your customer.

Later on July 7, 1993 at approximately 7:00 p.m., defendant Frank Williams left the following message on plaintiff's answering machine at her home:

Frieda, this is Frank Williams calling at 8:00 P.M. on Wednesday night east coast time. I'm calling regarding your refusal to endorse the joint check from Mortenson for the $275,000. I need to know whether that is your final decision or not because if it is your final decision and you won't endorse it, I intend to be in Salina and take whatever steps necessary to get it done whether it is through the court or whatever personal intervention can happen. I want a phone call from you tonight with a yes or no answer. I'll be at either 703–698–8928 or 703–938–1260. It is important that you let me know because I don't want to be sitting in your apartment tomorrow night demanding to know why. Thank you.

In the next two hours, defendant DuVal left three short telephone messages at plaintiff's home asking plaintiff to call him or John Bosworth, the president of Beasley. Plaintiff had a lengthy conversation with Bosworth from 11:00 p.m. to 1:00 a.m. that night.

Defendant Williams left the following message at approximately 10:15 p.m. central time on plaintiff's home answering machine on July 7, 1993:

Frieda, this is Frank Williams calling again at 11:15 eastern time. I again want to tell you you're making a big mistake. I have talked to Bosworth and Frank DuVal both tonight. I understand you won't talk to them. Mr. Halverson tells me that you will not agree to the release of the $275,-000. I need to warn you that this whole thing is going to get exposed in the Salina Journal. I intend to call a press conference in Salina to tell the whole story. I intend to file an involuntary bankruptcy petition and I intend to file a lawsuit. I intend to put you out of business in total. I intend to take this to the National Erectors Association and advise every steel erector in the United States, and I might add that Bill Lanfair is the president of the National Erectors Association. You will not get another job erected anywhere. I don't think you understand the magnitude of this problem. I don't think you understand the trouble that you're in. You either sign this joint check and call Mr. Halverson tomorrow and tell him you intend to sign the check or all these doomsday things are going to come to pass. And I hope that I don't have to do this. I am normally a gentle person, but I will do whatever I can do to destroy PKM Steel and believe me I think you can tell by what Mortenson's agreed to do and the problems that I've created for them on the Dulles job that I'm serious, that I have a lot of people that listen to what I have to say. I think you had better start listening and you better start listening quick because if you don't, you're in a world of trouble. I hate to do this to you. I like you and I like your dad, but you will be destroyed in total. There will be no PKM Steel within the next 6 months unless you

agree to sign this check and I hope that you understand this because this is not the way we like to do business. You need to talk to DuVal tonight. He intends to call you every hour on the hour until the night is over and continue that tomorrow and I intend to call you every hour on the hour beginning at 6:00 your time tomorrow morning. Thank you.

At approximately 6:30 a.m. on July 8, 1993, defendant Williams left this message on plaintiff's home answering machine.

Frieda, this is Frank Williams calling at 6:30 your time. I know you are there, you might as well answer the phone. I'm going to catch up with you some way some how even if I've got to come and sit on your front steps.

I didn't tell you last night but I want you to know I've run a pretty extensive background check on your man Steve Hartsuff. He will not hold up in court. We will break him down with his background immediately. So you had better not intend on using him to be involved. We've got enough to hang him. So you had better get with it Frieda and you better agree to sign that check today, you better call our boy in Denver and tell him because I intend to be on your doorstep Monday morning and I will continue to stay there until something happens. I hope you can get the police to arrest me for trespassing because that is exactly what I want because that will trigger the press conference I'm looking for with the Salina Journal. If DuVal and Bosworth don't have the *guts* to do it I will. I'm not fooling, I'm not kidding, it's going to happen. You had better straighten up, you better get your act together because I will be sitting there and you will not see the last of me. PKM Steel won't find an erector to put up another job for them forever. OK. Bye.

Plaintiff also received two "hang-up" calls during the early morning hours of July 8, 1993. For the purposes of the instant motions, the court shall assume defendants were responsible for the calls.

Also, on July 8, 1993, defendant Williams sent the following three facsimile messages to plaintiff:

As a result of conversations today, Mr. Steve Hartsuff will be subpoenaed to come to Washington, D.C. to give extensive depositions in conjunction with his former employer's default on the Maryland State Correctional Facility Project in Cumberland, Maryland.

This Fax is to confirm the message I left with your receptionist. Unless you return my phone call before the close of business today or agree to sign over the $275,000 check, I will be permanently sitting on your doorstep or camping out in your front yard.

Will arrive Kansas City US Air Flight 577 at 7:45 p.m. on Sunday, July 11. Will be at your house as soon as practicable thereafter.

On the same day, plaintiff contacted an attorney who faxed a letter demanding that defendants cease and desist their "harassment" tactics. The next day, July 9, 1993, plaintiff filed this case.

### THRESHOLD REQUIREMENTS FOR THE TORT OF OUTRAGE

 There are two threshold requirements for the trial court's determination when a claim of outrage is asserted: "(1) whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) whether the emotional distress suffered by the plaintiff is of such extreme degree the law must intervene because no reasonable person should be expected to endure it." *Fusaro v. First Family Mortgage Corporation, Inc.*, 257 Kan. 794, 897 P.2d 123, 131 (1995).

### THRESHOLD DETERMINATIONS

Upon our review of the record, we do not believe defendants have demonstrated an absence of a fact issue regarding the degree of emotional distress suffered by plaintiff. However, we do hold that no reasonable jury could find that defendants' conduct was so extreme and outrageous that recovery should be had.

 "[F]or conduct to be deemed sufficient to support the tort of outrage, it must be so outrageous in character and so extreme

in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* "The classic test is that liability may be found to exist when the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, 'Outrageous!' " *Id.*

■ " 'It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind.... Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper.' " *Taiwo v. Vu,* 249 Kan. 585, 822 P.2d 1024, 1029 (1991) (quoting *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981)).

■ The court has considered the following factors in rendering this decision. There was not a great disparity in power between the parties to this matter. They were experienced high-echelon business people with considerable resources and ready access to legal counsel to protect their rights. We acknowledge plaintiff's claim that defendants considered plaintiff to be inexperienced in construction disputes and a weak negotiator who became emotional in certain previous discussions. But, any hunch or idea that hardball tactics might be successful against plaintiff is distinguishable in our opinion from knowledge that a person is susceptible to emotional distress by reason of some physical or mental condition or peculiarity. The law recognizes that some behavior may be considered outrageous when committed with such knowledge. See *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 529 P.2d 104, 109 (1974). The evidence in this case does not support a claim that defendants had such knowledge or acted with the intent to cause unreasonable emotional distress.

■ Additionally, the controversial actions were confined to verbal or written comments over a brief span of time. There were no overt or direct threats of physical harm. The court also does not believe a reasonable person would construe the actions and words as threatening physical harm. Someone who supposedly would welcome an arrest for trespass because of the publicity it would bring is threatening nonviolent, rather than violent, action. To threaten to file litigation in a bona fide dispute is certainly not outrageous. See *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1, 9 (1975) (threatening foreclosure of loans is not outrageous conduct). Nor is it threatening or outrageous to have the home address of someone from whom one is attempting to collect money. Finally, the court has considered the context of the comments and actions. A massive construction project was involved. Payment was vital to the businesses involved. Reputation for payment and performance was also important. In this context, the court believes it is not unusual, but not necessarily justifiable, for hardball tactics to be employed. Therefore, while the court does not approve of all of defendants' actions, the court finds that no reasonable jury would conclude the actions were so beyond the bounds of decency as to be considered atrocious and utterly intolerable in a civilized society.

*CONCLUSION*

For the above-stated reasons, defendants' motions for summary judgment are granted.

**IT IS SO ORDERED.**