Ruth SMITH, Plaintiff-Respondent,

v.

STANDARD OIL, DIVISION OF AMOCO OIL COMPANY, Defendant-Appellant,

and

A. T. Leasing Company d/b/a Chromalloy Rents, Defendant-Appellant.

Nos. 38802, 38803.

Missouri Court of Appeals,
St. Louis District,
Division Three.

May 2, 1978.

Motion for Rehearing and/or Transfer
Denied June 8, 1978.

Application to Transfer Denied
July 24, 1978.

Terry A. Bond, Luke, Cunliff, Wilson, Herr, Chavaux & McCluggage, St. Louis, for Standard Oil.

Ralph Kleinschmidt, Evans & Dixon, St. Louis, for A. T. Leasing.

Godfrey Padberg, Padberg, McSweeney & Slater, St. Louis, for plaintiff-respondent.

GUNN, Presiding Judge.

Plaintiff's action is against A. T. Leasing Company, doing business as Chromalloy Rents (Chromalloy), for libel and tortious interference with contract and against Standard Oil, Division of Amoco Oil Company (Amoco), for intentional infliction of emotional distress. The trial court sustained Chromalloy's motion for directed verdict at the close of all evidence, and plaintiff has appealed this ruling. The jury awarded plaintiff $5,000 actual and $10,000 punitive damages against Amoco. Amoco has appealed from the judgment against it in favor of plaintiff Smith. We reverse as to the judgment adverse to Amoco, affirm as to the directed verdict in favor of Chromalloy on plaintiff's libel action and reverse as to the directed verdict in favor of Chromalloy on tortious interference with contract.

To achieve a denouement in this case, we are required to make a rather tedious trek through the facts as presented. Plaintiff was the holder of a "Torch Club" credit card issued by Amoco in conjunction with Diner's Club. Under the terms of the credit contract, plaintiff was permitted to use the credit card for purposes other than charges for products and services from Amoco. On at least four occasions prior to the incident leading to this action, plaintiff had accompanied her daughter Jacquelyn to the Chromalloy car rental facilities and had allowed her Amoco credit card to be used as security for monthly rental of a car by her daughter. On each occasion, the daughter paid the rental charges with her own funds when she returned the car, and no charge was made on plaintiff's charge account. In February, 1974, the daughter rented a car from Chromalloy without plaintiff's knowledge or, at least, without permission to use the plaintiff's Amoco card as security. Inasmuch as the daughter had previously rented cars using the plaintiff's card as collateral, the Chromalloy employee handling the rental arrangement erroneously assumed that the same situation applied and copied plaintiff's card number on the rental agreement as had been done in the past. But this time plaintiff's signature was not obtained on the rental agreement as it had been on prior occasions. The plaintiff had not in fact authorized the use of the credit card as security for her daughter's car rental.

In May, 1974, plaintiff received her Amoco bill for $725.39 for charges made on her account. The bill contained a charge of $211.55 for the unpaid balance due on the car rental by plaintiff's daughter which had not been authorized by plaintiff. The remaining $513.84 (the difference between $725.39 and $211.55) represented charges which plaintiff had made on her account. Plaintiff complained by telephone and in writing to Amoco about the unauthorized charge of $211.55 and at a later date was credited with that amount. After this adjustment, her charge account properly indicated slightly over $500 still due and owing. During Amoco's investigation of plaintiff's complaint, it contacted Chromalloy about the $211.55 charge and was advised by letter from a Chromalloy employee as follows:

"Attached please find a copy of rental agreement # 1774, concerning charges $211.55. Miss Jacquelyn Smith, daughter of Mrs. Ruth Smith did not qualify for rental without a major credit card and her mother presented her diner's card for credit in lieu of any problems of nonpayment from Jacquelyn. Miss Jacquelyn Smith was able to pay only $73.00 of a rental amounting to $284.55, the remainder was charged to her mother's card, $211.55.

Attached, also find a copy of rental agreement # 1511, in which both mother

and daughter's names and signatures appear on the same rental agreement using the same diner's club card as credit backing, this agreement they paid in cash. This is for your information and further handling."

Rental agreement # 1511 had covered a previous car rental by the daughter, and plaintiff had indeed signed the agreement and allowed her credit card to be used. But plaintiff had not signed rental agreement # 1774, nor had she permitted use of her credit card.

Thereafter, the $211.55 charge was reinstated. After August, 1974, plaintiff made no further payments on her account—neither the $211.55 which had been mischarged as a result of her daughter's car rental nor the $513.84 for which plaintiff was responsible. Throughout September, 1974, Amoco unsuccessfully pressed for payment and in October cancelled her credit privileges, demanded return of the credit card and suggested that the matter would be referred to its attorney or a collection agency. In November, 1974, plaintiff, by letter to Amoco, reiterated that she was not liable for the $211.55 and returned the credit card as had been demanded. In early December, 1974, plaintiff received three telephone calls from Amoco described by her as neither loud, abusive nor insulting, in which the credit mix-up was discussed. Plaintiff received a letter dated December 5, 1974 from an Amoco attorney urging payment of the account. This letter was followed by another bill for the $211.55, plus the charges actually owed by plaintiff, with an added $9.56 interest charge and a $15 fee for renewal of her Amoco credit card. Plaintiff's next item of correspondence from Amoco was a January 1975 bill giving credit for $211.55 but including the credit card renewal and finance charge added to the balance over $500 still actually owed by plaintiff. Soon thereafter a letter from an Amoco attorney requesting payment in full

was received by plaintiff. In April and in May, 1975, plaintiff received two other letters from a collection agency requesting payment of her account. The tenor of these letters was the same as those from Amoco—businesslike, but inoffensive. In addition to the letters, plaintiff received three telephone calls during April from an employee of the collection agency urging her to settle her account. The calls were made during normal working hours, each about one week apart. According to plaintiff, the agency representative used the words "hell" and "damn" in his conversations.[1] No other invectives or expletives were used. In May, 1976, plaintiff was advised that $211.55, less a 5% processing discount rate, had been finally credited to her account. Without paying anything, including the undisputed amount she owed, plaintiff instituted this action.

 We first consider plaintiff's cause of action against Amoco for intentionally inflicting emotional distress upon her. Plaintiff testified that the telephone calls and collection letters "upset" her. During the trial plaintiff indicated that she had seen a doctor for treatment of her upset condition, but any effect of this evidence was erased by her obligation to provide information responsive to the interrogatories inquiring as to medical treatment and her answers to those interrogatories which denied that she had received any medical treatment.

The law in Missouri regarding action for intentional infliction of emotional distress, commonly referred to as the tort of outrage, is clear. In *Pretsky v. Southwestern Bell Telephone Company*, 396 S.W.2d 566, 568–69 (Mo.1965), the Missouri Supreme Court adopted from Restatement (Second) of Torts, § 46 (1965), as the standard of liability for outrageous conduct, the following:

---

1. At the most, there were two "hells" and one "damn" recited. Plaintiff testified that the agency representative said: "Why in the hell don't you sell that damn TV and pay those people, what the hell do you think." An apparent reference was being made to the fact that plaintiff's TV was heard over the telephone by the representative at the time the calls were made.

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse the resentment against the actor, having led to exclaim 'outrageous!' "

Mere insults, indignities, inconsiderations or petty oppressions do not rise to the level of the outrageous conduct essential to plaintiff's right of recovery. *Pretsky v. Southwestern Bell Telephone Company,* supra; *Hood v. Naeter Bros. Publishing Co.,* 562 S.W.2d 770 (Mo.App.1978).

The alleged outrageous conduct which "upset" plaintiff consisted of a series of letters from Amoco, three telephone calls from Amoco's credit department, three form letters from a financial collection agency—all of which were admittedly non-abusive in nature—and three telephone calls from the agency. The only telephone call which could be considered in any way abusive—but which we hold not to be grossly so—came from a collection agent whom plaintiff accused of saying "hell" and "damn" on one, or perhaps two, instances ("Why in the hell don't you sell the damn TV and pay those people"). All communications were over the course of twelve months, and the telephone calls were made during usual working hours. Under the circumstances of this case and gauged by the standard adopted in *Pretsky,* we hold as a matter of law that the alleged conduct here is not of the extreme and outrageous nature contemplated by § 46 of the Restatement (Second) of Torts. The judgment in favor of plaintiff against Amoco must be reversed. *Nelson v. Grice,* 411 S.W.2d 117 (Mo.1967); *Pretsky v. Southwestern Bell Telephone Company,* supra; *Hood v. Naeter Bros. Publishing Co.,* supra; *Kuehner v. Denny Loan Corporation,* 518 S.W.2d 94 (Mo.App.1974).[2]

▮ We now turn to plaintiff's claim against Chromalloy for libel and tortious interference with contract. Plaintiff's claim against Chromalloy rests on the following portion of a letter written by Chromalloy to Amoco:

"Miss Jacquelyn Smith, daughter of Mrs. Ruth Smith did not qualify for rental without a major credit card <u>and her mother presented her diner's card for credit in lieu of any problems of non-payment from Jacquelyn</u>." (emphasis added)

The underlined portion of the letter was of course incorrect, for plaintiff in this particular instance had not presented her credit card as collateral for her daughter's car rental as had been done on previous occasions. As a result of the false statement in the letter, a jury could find that the unwarranted $211.55 charge was reinstated and that upon plaintiff's refusal to pay this charge her Amoco and Diner's credit was revoked. While the $211.55 charge was ultimately withdrawn, plaintiff did lose her credit privileges which were restored only upon her paying a new application fee of $15. Additionally, a finance charge, presumably for the non-payment of the $211.55, was added to plaintiff's bill—at least there was no evidence that the interest charge was on the $500 balance actually owed by plaintiff.

Plaintiff acknowledges that the wording of the Chromalloy letter to Amoco is not libelous per se. Hence, she relies on libel per quod for her recovery, which necessitates proof of defamation by extrinsic facts. *Langworthy v. Pulitzer Publishing Co.,* 368 S.W.2d 385 (Mo.1963). See also, *Missouri Church of Scientology v. Adams,* 543 S.W.2d 776 (Mo. banc 1976), and *Williams v.*

---

**2.** For examples of conduct held to be outrageous, see *Warrem v. Parrish,* 436 S.W.2d 670 (Mo.1969), where defendant held plaintiff for three hours on a car lift. Also, see, *Liberty Loan Corp. of Antioch v. Brown,* 493 S.W.2d 664 (Mo.App.1973), where a loan company officer telephoned eight to ten times within an hour at the debtor's place of employment, casting aspersions on the chaste character of the debtor, her family heritage, and threatening harm to her daughter.

*Gulf Coast Collection Agency Co.*, 493 S.W.2d 367 (Mo.App.1973).[3] Plaintiff concedes that to make her case for libel she must show "malicious defamation" of her person. Plaintiff relies on and quotes from *Diener v. Star-Chronicle Pub. Co.*, 232 Mo. 416, 135 S.W. 6, 11 (1911), the following definition of malicious defamation:

> "To make a libel, there must be defamation in the sense of the law, before the public scorn and contempt feature is operative. Defamation includes the idea of calumny, aspersion by lying; the injury of another's reputation in that way. To defame is to speak evil of one maliciously, to dishonor, to render infamous." Accord *Brown v. Kitterman*, 443 S.W.2d 146 (Mo. 1969); *Williams v. Gulf Coast Collection Agency Co.*, supra.

As a matter of law, we find that the statement in Chromalloy's letter to Amoco is not defamatory under § 559.410 and as defined in *Diener v. Star-Chronicle Pub. Co.*, supra. The statement implies no more than that plaintiff is wrongfully refusing to pay a charge. There is no vicious attack on her character or reputation which could subject her to public scorn. Plaintiff's case for libel per quod therefore fails, and the trial court was correct in sustaining Chromalloy's motion for a directed verdict as to that count.

However, in viewing the evidence in the light most favorable to the plaintiff and resolving all conflicts in her favor, we believe a jury could find tortious interference of contract. The essential elements for tortious interference of contract as stated in *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 212 (Mo.App.1976), are as follows:

> "1) that a contract was in existence; 2) that the defendant had knowledge of the contract; 3) that the defendant induced or caused the breach of the contract; 4)

that the defendant's acts were not justified; and 5) that the plaintiff thereby suffered damages."

Although under the plaintiff's evidence the jury would not be impelled to do so, we believe that it could find that the letter written by Chromalloy was unjustified and did cause plaintiff's credit with Amoco-Diner's Club to be cancelled, causing her damages on this record of at least the amount of a $15 re-application fee and interest charges on the unpaid $211.55. As we have said, there is nothing within the record to indicate that the plaintiff's loss of credit card or assessed interest charge was attributed solely to her failure to pay the $513.84 actually owed. Rather, the evidence appears to be that Amoco cancelled the credit card and assessed the interest charges after receipt of the letter from Chromalloy indicating that plaintiff had presented her credit card as security for her daughter's car rental—a misstatement.

Judgment as to Amoco for outrageous conduct is reversed. Judgment on directed verdict in favor of Chromalloy on the charge of libel per quod is affirmed. Judgment on directed verdict in favor of Chromalloy on charge of tortious interference of contract is reversed and the cause remanded for trial on that charge.

SIMEONE, C. J., and KELLY, J., concurs.

---

**3.** For a thorough treatment on libel per quod, see Eldredge, *The Spurious Rule of Libel Per Quod*, 79 Harv.L.Ed. 733 (1966), and Prosser, *More Libel Per Quod*, 79 Harv.L.Ed. 1629 (1966).