Debra LEONARD and Wanda Leonard, Appellants-Respondents,

v.

PIONEER FINANCE COMPANY, Respondent-Appellant.

Nos. KCD 28957, KCD 28960 and KCD 28961.

Missouri Court of Appeals, Kansas City District.

June 12, 1978.

Motion for Rehearing and/or Transfer Denied July 20, 1978.

Gene C. Morris, Pieter A. Brower, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, for appellants-respondents.

Joseph W. Amick, Kansas City, for respondent-appellant.

Before SHANGLER, P. J., and SWOFFORD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Plaintiff Wanda Leonard and plaintiff Debra Leonard each filed a separate lawsuit against defendant Pioneer Finance Company for damages because of Pioneer's conduct in its efforts to collect notes signed by Debra. Those two cases were consolidated for trial. From a judgment on jury verdicts for both plaintiffs, Pioneer appeals. From a judgment for Pioneer on its counterclaim against Debra, she appeals.

The controversy arose out of the following basic facts. Debra and her husband signed a note to Pioneer in 1971 when she was 18 years old, and she and her husband signed a renewal note in 1972 when Debra was 19 years old. That indebtedness fell delinquent in August, 1973. Pioneer's employees then began collection efforts which included unsuccessful efforts to reach Debra and her husband Darryl at their home.

Pioneer had in its records information that Darryl worked for Joseph A. Leonard. Joseph was Darryl's uncle and was also the husband of plaintiff Wanda. Pioneer's employees made calls to the Joseph Leonard phone number seeking to leave messages for Darryl to call the Pioneer office, because they could not reach him at his home phone. Joseph responded that Darryl did not live at that number, that he no longer worked for Joseph and Joseph asked that Pioneer's employees leave him alone. Nevertheless, Pioneer's employees made three further telephone calls thereafter.

On September 19, 1973, Pioneer's trainee collection agent, James Cook, went out to make collection calls with his supervisor, John Brewer. In the course of their rounds they drove to the home of Darryl and Debra Leonard in Blue Springs, but found no one there. This constituted the last of a series of calls which had been made to the Leonard residence, and on a number of the previous occasions notes had been left for the Leonards to get in touch with Pioneer about their delinquent account. At the time of the call on September 19, the two Pioneer agents left a further note for the Leonards which read as follows: "This is the third time we have tried to reach you at home; we are not Yellow Cab Company, but feel like it. Please contact our office at 756–2020. If not, we will ruin your good credit standings."

The Pioneer agents received information from a neighbor that Debra was working at a beauty shop and they proceeded to ascertain its name and location. After their leaving of the note at the Leonard residence, they proceeded to the beauty shop. Both entered and were greeted by Wanda Leonard, who was the proprietor and the one for whom Debra worked. Wanda was 44 years old. The two collectors asked for Mrs. Leonard, and Wanda responded that she was Mrs. Leonard. The men then told her that they were from Pioneer and wanted to know when she was going to pay her bill. Wanda denied owing any money. Thereupon the men asked about her address and said they had been to her house several times and "you must be trying to duck us, we never get any response." They asked whether she lived at 517 Northeast Third, to which Wanda answered in the negative. They then asked whether her husband's name was Darryl, and she responded "No, my husband's name is Joe." Upon receiving that information, according to Wanda's testimony, "They sort of looked at each other" and started to leave. Wanda further testified that as they started out the door, Brewer said "We will just file suit."

Wanda then called her son and after getting him on the phone, looked out and saw the two Pioneer collectors still there. She beckoned them to come in and directed Brewer to the telephone where he was engaged in conversation by Wanda's son. At that same time, Cook asked Wanda whether

Debra Leonard worked in the beauty shop, to which Wanda answered in the affirmative; but when Cook asked for permission to speak to Debra, Wanda refused. When Brewer finished the telephone conversation, both men left. They both got in their automobile which was in a parking lot close to the entrance of the beauty shop, where they waited to talk to Debra when she came out at the noon hour. When Wanda observed this, she called the police, who came to the parking lot and asked the Pioneer collectors to leave, which they did.

Wanda testified that this episode upset her and made her nervous. She took tranquilizers for two or three days and returned to normal within a week. Debra testified that as a result of the occurrence on September 19, she was very upset, cried a good deal and did not return to normal for approximately two or three months.

Wanda submitted her claim to the jury on the theory of outrageous conduct. Debra submitted to the jury a claim based on outrageous conduct and also a separate claim for invasion of privacy. The jury awarded Wanda actual damages of $2,000 and punitive damages of $8,000. It awarded Debra actual damages of $1,000 and punitive damages of $1,500 for outrageous conduct and $500 actual damages for invasion of privacy. The trial court, however, set aside the award to Debra for invasion of privacy. Pioneer's counterclaim against Debra for the unpaid balance on the note indebtedness was tried to the court and resulted in a judgment in favor of Pioneer for $1,262.00.

On this appeal, Pioneer contests the judgment in favor of Wanda on the grounds that: (1) her claim for outrageous conduct was beyond her pleadings; and (2) that her evidence did not support a finding of outrageous conduct. It contests the judgment in favor of Debra on the ground of insufficiency of the evidence to show outrageous conduct. For their part, both Wanda and Debra challenge Pioneer's right to maintain this appeal on the ground that Pioneer

made a payment in partial satisfaction of the two judgments and is therefore estopped to deny the judgments. Debra further contends on her separate appeal that she had no liability on the note indebtedness on the ground of infancy.

I.

*Wanda's Right to Recover*

The first count of Wanda's petition set forth classic allegations for slander, while her second count contained classic allegations of trespass to real estate. Pioneer argues that Wanda should not have been permitted to depart from those theories and submit to the jury on an unpleaded cause of action for outrageous conduct. That issue need not be resolved in view of our determination that Wanda's evidence was insufficient to sustain a verdict on the theory ultimately chosen by her for submission, namely outrageous conduct.

■ Missouri does recognize a cause of action for outrageous conduct as defined by Section 46 of the Restatement (Second) of Torts. *Pretsky v. Southwestern Bell Telephone Co.,* 396 S.W.2d 566 (Mo.1965); *Warrem v. Parrish,* 436 S.W.2d 670 (Mo.1969); *Smith v. Standard Oil,* Nos. 38802 and 38803, 567 S.W.2d 412, St. Louis District, Missouri Court of Appeals, decided May 2, 1978. The elements of this action are that the defendant must have by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to the plaintiff from which bodily harm results. This doctrine has found extensive expression in cases in which collection agencies have engaged in harsh and oppressive collection methods. The wide spread existence of abusive debt collection practices has been the subject of Congressional legislative findings in Fair Debt Collection Practices Act, 15 U.S.C.A., Section 1692. The right to recover damages in appropriate cases of this character is well recognized. *Clark v. Associated Retail Credit Men,* 70 App.D.C. 183, 105 F.2d 62 (1939); *Barnett v.*

Collection Service Co., 214 Iowa 1303, 242 N.W. 25 (1932); Moorhead v. J. C. Penney Co., Inc., 555 S.W.2d 713 (Tenn.1977); 38 Am.Jur.2d Fright, Shock, Etc., Sec. 44, p. 57; Annotation, Recovery For Emotional Distress Or Its Physical Consequences Caused By Attempts To Collect Debt Owed By Third Party, 46 A.L.R.2d 772. This right of recovery of damages for extreme cases of improper collection methods has also been recognized by the Missouri courts. Liberty Loan Corporation of Antioch v. Brown, 493 S.W.2d 664 (Mo.App.1973). See also Zimmerman v. Associates Discount Corp., 444 S.W.2d 396 (Mo. banc 1969) and Biederman's of Springfield, Inc. v. Wright, 322 S.W.2d 892 (Mo.1959).

Nevertheless, some leeway must be accorded to creditors to exercise legitimate efforts to collect debts due to them. As stated in Dawson v. Associates Financial Serv. Co. of Kan., Inc., 215 Kan. 814, 529 P.2d 104, l.c. 110 (1974):

"When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. * * In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt. * * *.

"In this area of the developing law, the business community must be given some latitude to pursue reasonable methods of collecting debts even though such methods often might result in some inconvenience or embarrassment to the debtor. * * * Debtors cannot.object to some inconvenience in connection with their creditor's efforts to collect a debt. It has been held that debtors' tender sensibilities are protected only from oppressive, outrageous conduct. * * *."

See also Public Finance Corp. v. Davis, 66 Ill.2d 85, 4 Ill.Dec. 652, 360 N.E.2d 765 (1977). In short, there are interests on the creditor's side as well as that of the debtor in this situation, both of which are entitled to recognition and protection. Greenfield, "Coercive Collection Tactics—An Analysis of the Interests and the Remedies," 1972 Wash. L.Q. 1.

It is necessary therefore to examine the particular facts here to ascertain whether the actions of the Pioneer collection agents were so extreme as to give rise to a cause of action on the part of Wanda. First to be noticed is the matter of the telephone calls made to Wanda's home and which were taken by her husband Joseph. The number of those calls as described by Joseph, particularly after he requested that they cease, are subject to criticism. However, on the other side of the equation are a number of factors. First of all, those calls were made for a legitimate purpose in order to get in touch with the debtors, Darryl and Debra Leonard, after efforts to reach them at their own home and at their own telephone number had proved unsuccessful. Further, the calls were made to the telephone given by Darryl as being that of his employer. Moreover, the calls by the Pioneer agents were not abusive nor slanderous, but merely sought to leave a message for the debtors to call the Pioneer office. It is to be particularly noted that none of these telephone calls were directed to Wanda and no Pioneer agent ever asked to speak to her or sought information about her. Still further, Wanda testified that she did not answer the telephone on any of these calls and that she was not even aware of them. Most telling of all, no complaint with respect to those telephone calls appears in her pleading nor does she complain of them in her testimony.

All of Wanda's allegations and all of her testimony focuses on the events which occurred at her beauty shop on the morning of September 19, 1973. Looking directly at those events, it is perfectly apparent that the two Pioneer collectors never had any intention of charging Wanda herself with any debt delinquency or any other personal wrongdoing. The adverse comments made to her occurred solely by reason of misiden-

tification which came about because Wanda and Debra share the same last name. After only a very brief conversation it became obvious to the participants and everyone in the beauty shop that a mistake of identification had occurred. Thus, Wanda herself admitted that she quickly realized that the two men were looking for Mrs. Darryl Leonard. Bonnie Saye, one of the beauty operators working in the shop at the time, likewise realized that it was a case of mistaken identification and she testified "It didn't take much to figure it out," and that "it was not Wanda who was delinquent in her bills." Similarly, another of the operators, Sandra Guthrie determined in her own mind that it was not Wanda who owed money to Pioneer when she heard the Blue Springs address mentioned "because I know Mrs. Leonard [plaintiff Wanda Leonard] doesn't live in Blue Springs."

Cook and Brewer themselves realized their error very quickly and it could not have been more than a few minutes before they left the beauty shop. Wanda talks of them as speaking in a loud tone of voice and being rude, and Saye described their behavior as "very loud, very rude, very unmannerly, very businesslike," and Guthrie characterized their attitude as arrogant, rude and not businesslike. Nevertheless, the language and conduct of Cook and Brewer during the short time they were in the shop hardly rose to the quality of being abusive.

The men returned to the shop only when beckoned to do so by Wanda herself. By that time they had figured out that there must be two Mrs. Leonards and in the second conversation with Wanda, Cook did ask for Mrs. Debra Leonard and whether he could speak with her. Upon a rejection of this request, the two men left the beauty shop without any further incident. The fact that they continued to wait outside in the hope of being able to finally speak with their elusive debtor hardly rises to the level of unreasonable or oppressive conduct.

■ Under all the facts of this case, it cannot be said that the conduct toward Wanda was so outrageous as to give rise to a cause of action for damages. As Section 46 of the Restatement (Second) at p. 73 states: "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt." Similarly, Professor Magruder states in his much quoted article "Mental and Emotional Disturbance In The Law of Torts," 49 Harvard L.Rev. 1033, l.c. 1035: "Quite apart from the question how far peace of mind is a good thing in itself, it would be quixotic indeed for the law to attempt a general securing of it. Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be."

■ Moreover, a cause of action arises only when the plaintiff has been caused severe emotional distress. Section 46 j. of the Restatement (Second) at p. 77 states:

"Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity."

In this connection, it is to be noted that Wanda complained of no loss of working time, that she required only tranquilizers for merely two or three days and that she was back to normal in a week. This scarcely adds up to the type of severe emotional distress required to give a cause of action.

■ Missouri cases have emphasized that to have a cause of action on this theory, "the plaintiff must show that defendant's

conduct was extreme, outrageous, atrocious, utterly intolerable, and beyond all possible bounds of decency." *Watson v. Franklin Finance*, 540 S.W.2d 186, 189 (Mo.App. 1976); *Kuehner v. Denny Loan Corporation*, 518 S.W.2d 94, 96 (Mo.App.1975). Although such conduct may have existed in *Watson v. Franklin Finance, supra,* and in *Zimmerman v. Associates Discount Corp., supra,* and was found to exist in *Liberty Loan Corporation of Antioch v. Brown, supra,* a like characterization cannot be given to Pioneer's conduct in this case. Rather, Pioneer's conduct here is more akin to the conduct found to be non-actionable in *Smith v. Standard Oil, supra,* and in *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1 (1975) and *Public Finance Corp. v. Davis,* 36 Ill. App.3d 99, 343 N.E.2d 226 (1976).

## II.

### Debra's Right to Recover

 Most of what has already been said with respect to Wanda's claim applies likewise to Debra's claim. The only additional fact to be considered in connection with Debra's claim is the factor of the note which was left at her home by the two Pioneer collectors.

That note was indeed abrupt and threatening. Cook, who is now a collection supervisor, admitted in his testimony that this note constituted an improper tactic with poorly chosen wording, and he further admitted that the note in question was intended to cause concern and to prod Darryl and Debra to responsive action. However the doctrine of outrageous conduct does not rule out a right on the part of the creditor to cause some worry and concern to his debtor in order to bring about payment of the debt. *Clark v. Associated Retail Credit Men, supra* 105 F.2d at l.c. 66. The note in question, although not free from objection, is not so extreme as to rise to the caliber of outrage.

## III.

### Payment on the Judgment as Foreclosing Appeal

 The partial satisfaction of the judgment occurred by reason of the following unusual facts. Pioneer was insured by Foremost Insurance Company, who furnished a defense on behalf of Pioneer in the Circuit Court through Mr. Robert S. McKenzie. On July 22, 1976, ten days after the court overruled defendant's motion for new trial, an entry of appearance was made on behalf of Pioneer by new lawyers, Rogers, Field, Gentry, Benjamin & Robertson. On the same day, Mr. Gene Morris of the newly appearing law firm filed notice of appeal in both of the pending cases in which judgment had been entered against Pioneer. Both of those appeals are endorsed by the circuit clerk to show that formal notice of the appeal was being given not only to the attorneys for the plaintiffs, but also to Mr. McKenzie. Thereafter, on October 11, application was made for additional time to file transcript on appeal and that time was extended to December 20, 1976.

On October 21, 1976, while the transcript was in preparation, one of the attorneys for the plaintiffs and Mr. McKenzie appeared in the office of the court administrator. Mr. Amick, on behalf of Wanda, acknowledged satisfaction of the judgment for compensatory damages only in the amount of $2,000, plus interest and costs, and he acknowledged similar partial satisfaction on behalf of Debra for $1,000 compensatory damages, plus interest and costs. Both of these satisfactions were witnessed by "R. S. McKenzie, Attorney for Defendant." However, on December 3, 1976, the parties filed a stipulation in the circuit court that the consideration for those partial satisfactions was furnished by Foremost Insurance Company and was entered of record by Mr. McKenzie "counsel retained by Foremost Insurance Company to defend Pioneer Finance Company in accordance with the policy of insurance issued by Foremost Insurance Company to Pioneer Finance Company."

Under Missouri law, a defendant who makes payment on a judgment against him is barred from appealing from that judgment only if the payment was made by him

voluntarily. *City of Versailles v. Ross*, 208 S.W. 454 (Mo. banc 1919); *Berry v. Equitable Fire & Marine Ins. Co.*, 317 Mo. 1119, 298 S.W. 63 (1927); *Plogstart v. Rothenbucher*, 37 Mo. 452 (1866); *Ryan v. Engelke*, 285 S.W.2d 6 (Mo.App.1955); *Lumaghi v. Abt*, 126 Mo.App. 221, 103 S.W. 104 (1907). Respondents here contend that the partial satisfactions entered on October 21, 1976, were voluntarily paid on the part of Pioneer. However, an evaluation of the facts of the matter show that this simply was not true.

Pioneer and its insurer Foremost proceeded along harmoniously in tandem until the conclusion of the proceedings in the trial court. At that point, their interests and desires sharply diverged. While the record does not spell out the reason for the divergence, that reason is not hard to guess. The Foremost policy probably contained provisions which could be read as not providing coverage for punitive damages. See *Crull v. Gleb*, 382 S.W.2d 17, 23 (Mo.App. 1964); cf. *Colson v. Lloyd's of London*, 435 S.W.2d 42, 46 (Mo.App.1968). It is to be noted that the punitive damages awarded in this case aggregated $9,500, constituting the largest part of the judgment. In any event, it is obvious that Pioneer desired to appeal, while Foremost did not desire to do so.

Accordingly, Pioneer proceeded to retain its own law firm who did file notice of appeal in each of the cases. Significantly, Pioneer's new lawyers treated McKenzie, who had tried the case on behalf of Pioneer, as an adversary rather than as a colleague, for they served him with notice of appeal just as they did the lawyer representing the two judgment creditors.

Although McKenzie did not formally withdraw from the case on behalf of Pioneer when Pioneer's new lawyers entered their appearance, from that point forward McKenzie was representing the separate interest of Foremost, not Pioneer. When he appeared in the clerk's office to make partial satisfaction of the judgments on October 21, 1976, he made that payment with money furnished by Foremost and his act of payment was obviously on behalf of Foremost to satisfy the obligation of the latter under its insurance policy. There is no evidence that Pioneer or its new lawyers were even aware that the payments in question were being made, much less that Pioneer consented thereto. Under these circumstances it cannot be said that the partial satisfactions were voluntarily made by Pioneer. *Union County Board of Review v. Hotel Investment Co.*, 250 Iowa 59, 92 N.W.2d 397 (1958); *Anderson v. New Orleans Ry. & Light Co.*, 133 La. 896, 63 So. 395 (1913); *Freeman v. Wintroath Pumps*, 13 Ariz.App. 182, 475 P.2d 274 (1971); *Diamond v. Grow*, 243 Cal.App.2d 396, 52 Cal. Rptr. 265 (1966); Annotation, "Defeated party's payment or satisfaction of, or other compliance with, civil judgment as barring his right to appeal," 39 A.L.R.2d 153, Sec. 2, p. 156.

## IV.

### *Debra's Minority as a Defense to the Notes*

At the time Debra signed the original note to Pioneer in 1971, she was 18 years old and when she signed the renewal note in 1972, she was still only 19 years old. Under the law as it existed at that time, no suit could have been maintained against her on either note because Section 431.060 RSMo. 1969 fixed the minimum age of liability at 21 years. Although that age was reduced to age 18 by the 1974 amendment to that statutory section, and the amendment was in effect at the time this case was tried, no issue has been raised by the parties herein with respect to the possible retroactive effect of the 1974 amendment. We proceed to discuss this issue on the assumption that the 1974 amendment is not applicable and that Debra is entitled to the protection of Section 431.060 as it existed at the time these notes were signed by her.

Debra became 21 years of age on May 10, 1973. She therefore was already 21 years

of age at the time of the events heretofore described which occurred at the beauty shop on September 19, 1973. Shortly after those events, on October 6, 1973, Debra wrote and mailed to Pioneer a check to apply on the delinquency under the notes. Pioneer relies upon that payment as constituting a ratification of the indebtedness by Debra, effective to make her liable under Section 431.-060(2).

Debra argues that the payment in question does not constitute an affirmance of the contract, because: (1) she had had no earnings and had made no deposits to the checking account, all the deposits having been made by her husband Darryl, and therefore the account did not represent her funds; and (2) the check to Pioneer was written at the direction of Darryl and therefore did not constitute a voluntary recognition of the debt by Debra. This argument rests upon a mistaken concept of the nature of a joint account between husband and wife, in which all of the deposits have been made by the husband. Once the account is established in joint names, the account is presumed to be held in an estate by the entirety whether the husband or the wife or both furnished the monies that went into the account. *Fulton v. Fulton,* 528 S.W.2d 146, 157[28] (Mo.App.1975). Furthermore, the issues with respect to the counterclaim were tried to the court, who was privileged to disbelieve Debra's testimony that she wrote the check in question solely at the direction of her husband. The trial court cannot be held in error for having held that Debra ratified the indebtedness after reaching the majority and therefore is liable for the delinquent balance due.

The judgment is reversed to the extent that it renders judgments in favor of Wanda and in favor of Debra against Pioneer. The judgment is affirmed insofar as it renders judgment in favor of Pioneer on its counterclaim against Debra.

All concur.