506 F.Supp. 341 (1980)
M.J.S. RESOURCES, INC., Plaintiff,
v.
CIRCLE G. COAL COMPANY et al., Defendants.
No. 78-1268 C(2).
United States District Court, E. D. Missouri, E. D.
December 31, 1980.
*342 Gary A. Growe, Theodore D. Ponfil, Blumenfeld, Marx, Tureen & Paster, Stuard J. Radloff, St. Louis, Mo., for plaintiff.
Robert L. Inman, St. Louis, Mo., Richard C. Thomas, Bear, Hines & Thomas, Columbia, Mo., for Circle G. and Guilfords.
William G. Guerri and Gary Mayes, Thompson & Mitchell, St. Louis, Mo., N. William Phillips, Phillips & Spencer, Milan, Mo., for Missouri Mining and S & S Realty.

MEMORANDUM
NANGLE, District Judge.
This case is now before the Court for decision upon the merits. Plaintiff brought this suit pursuant to 28 U.S.C. § 1332, alleging causes of action against the various defendants based upon breach of contract, tortious interference with contractual and business relations, and fraud.
This case was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of the witnesses, the exhibits, and the depositions in evidence, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. The R.P.R. Ranch, consisting of some 1700 acres near Yates, Missouri, is owned by a partnership consisting of Ernie Rochester, Gerald Profita, Jarvis Ranier and their respective wives ("R.P.R."). Included within the ranch are 629 acres known as the Hemisphere tract.
2. In the fall of 1976, Rochester began discussing with Michael Schaffer, a New York resident involved in the development and funding of business ventures, the possibility of organizing a coal mining venture on the Hemisphere tract. Schaffer was an attorney experienced in tax shelters who had no experience in the coal mining business. The coal mining venture was designed to be a tax shelter for high income investors, made possible primarily through the very favorable tax treatment given the payment of advance royalties by the Internal Revenue Service at the time. This favorable treatment was to terminate on October 29, 1976, however, and the time for *343 organizing this prospective tax shelter was running out.
3. Rochester indicated to Schaffer that Floyd and Phillip Guilford, who ran the Circle G. Coal Company, might be available in the Yates area to do the actual mining of the coal. Circle G. is a Missouri corporation with its principal place of business in that state; Floyd and Phillip Guilford are Missouri residents. Floyd's son Ray and brother Phillip are the owners of Circle G. Floyd and Phillip Guilford, and Circle G. are defendants herein.
4. A lengthy meeting was held on October 20, 1976 among these parties, at which time the terms of a coal mining agreement were worked out. Also discussed at this meeting was the marketing of the coal. Though Schaffer was left with the impression that the Guilfords had agreed to market as well as mine the coal, the Guilfords did not understand themselves to have made any such commitment. The resulting difficulties were largely a result of this misunderstanding.
5. Schaffer was sole shareholder and principal officer of M.J.S. Resources, Inc. ("M.J.S."), plaintiff herein. M.J.S., which was organized in October 1976 for participation in this venture, is a New York corporation with its principal place of business in a state other than Missouri. Schaffer purchased St. James Associates, an Ohio limited partnership, on October 21, 1976 to participate in this venture. At the time of its purchase, St. James Associates conducted no business and had no assets or liabilities. The only business it has ever conducted is in connection with this venture. M.J.S. is the sole general partner of St. James Associates. It was Schaffer's intention to sell limited partnership interests in St. James Associates to high income investors, and he subsequently did so.
6. On October 21, 1976, R.P.R. entered into a coal mining agreement with Hemisphere Energy Corporation ("H.E.C.") for mining of the Hemisphere tract. H.E.C. is a corporation Schaffer helped organize in October 1976 to participate in this coal mining venture, and is run by a business associate of Schaffer's. Schaffer was first put in contact with Rochester by the principals of H.E.C. Schaffer assisted in the drafting of the lease. Pursuant to the lease, R.P.R. was to receive a royalty of $1.00 per ton for each ton of coal removed and sold from the Hemisphere tract, with a minimum royalty of $100,000.00 per year after the sixth year of the lease. R.P.R. received an advance royalty of $600,000.00, against which was to be credited the royalty payments as they became due. The minimum royalty provision was subsequently altered, such that the due date would be extended if Circle G. did not perform its obligations due to lack of equipment or capital.
7. On October 27, 1976, H.E.C. entered into a coal mining sub-lease with St. James Associates. Pursuant to this sub-lease, H.E.C. was to receive an 8% royalty on the gross price of coal removed and sold from the Hemisphere tract. An advance royalty of approximately $5.8 million was paid by St. James Associates  $850,000.00 in the form of a recourse note payable at the closing of the limited partnership offering, and a non-recourse note of $4,892,560.00 payable solely from coal production. It was the payment of this substantial advance royalty which generated the beneficial tax consequences to the limited partners.
8. Finally, a coal mining agreement between St. James Associates and Circle G. was executed on October 27, 1976, embodying the terms agreed upon by the parties on October 20, 1976. It had been drafted entirely by Schaffer, who, as stated earlier, was an attorney.
9. The provisions of this contract most relevant to this litigation are as follows:
1. Coal Partners, subject to the terms and conditions herein contained, does hereby engage and contract with Contractor for Contractor to mine, by the strip-mining or auger process and load on to trucks the following minimum quantities of merchantable coal from the aforesaid Hemisphere Tract:
Five thousand (5,000) tons of two thousand (2,000) pounds each per month, commencing December 1, 1976 thru December *344 31, 1977 and continuing at a rate of 10,000 tons per month thereafter until all mineable and merchantable coal has been mined provided, however, that the Contractor will mine from the Hemisphere Tract not less than one-third ( 1/3 ) of all coal mined by it, or any affiliate of it, during any twelve (12) month period up to a total of no less than three hundred thousand (300,000) tons annually from the Hemisphere Tract.
. . . . .
3. Contractor promises, covenants and agrees that it will mine, process and load on to trucks an amount of Coal at lease [sic] equal to the quantities of Coal specified in paragraph 1, commencing December 1, 1976, or later if Coal Partners so desire.
. . . . .
16. ... It is understood that under this Agreement, Coal Partners has retained and continues to retain full and complete control, custody, and possession of Coal `Partners' coal properties under its respective deeds or lease agreements, and the leasehold estates thereby created and all rights and interests therein, it being the intention of the parties hereto that Coal Partners has merely engaged Contractor to mine by the strip-mining or auger methods and remove, process, load and deliver certain Coal Contained in the property covered by said leases or deeds as aforesaid, the rights of Contractor being herein set out.
. . . . .
18. It shall be the responsibility of Contractor to obtain from the State of Missouri and/or its Division of Reclamation of its Department of Natural Resources and/or from the federal government such bonds and permits as may be required for mining....
. . . . .
19. (a) Subject to the terms, conditions, covenants, promises and premises herein set out, as compensation for its mining, processing and loading services under this Agreement, Contractor is to be paid the sum of Eleven Dollars and Fifty Cents ($11.50) per ton for each ton of two thousand (2,000) pounds mined, processed and loaded on to trucks by Contractor for the life of this Agreement.
(b) Contractor agrees that it will place a McNally coal washer in operable condition on the Hemisphere Tract no later than July, 1977 and that, if Coal Partners so requests, it will wash Coal mined from the Hemisphere Tract for the sum of One Dollar Fifty Cents ($1.50) per ton for the life of this Agreement.
(c) Payments to Contractor shall be made within five (5) business days after payment for said Coal is received by Coal Partners. However, Coal Partners agree to pay a 1% per month charge to Contractor on his receivables over 55 days old.
20. Eighteen (18) months after the date of this Agreement, either the Contractor or Coal Partners may cancel this Agreement upon ninety (90) days written notice to the other party.
21. Anything herein to the contrary notwithstanding, it is understood and agreed that Coal Partners shall be liable to the Contractor only to the extent that mining services are performed hereunder at the specific request of Coal Partners and, further, that Coal Partners shall have no obligation to pay for mining and loading services performed hereunder unless and until sales of such Coal so mined and loaded have been made by Coal Partners or by the mining Contractor on behalf of Coal Partners. Accordingly, in the event that Coal Partners notifies the Contractor that it is unable to sell Coal which is otherwise to be mined hereunder, Contractor shall abide by such notification and shall mine and load only such tonnage as is requested by Coal Partners, and Coal Partners shall be obligated to pay for such services as stated above.
10. The contract made no mention, either explicitly or implicitly, of the marketing responsibilities Schaffer believed Circle G. had agreed to assume. There is also no provision in the contract granting Circle G. exclusive rights to mine the Hemisphere *345 tract. Inclusion of these two factors would have been a simple matter, and would have helped to minimize the later problems.
11. The minimum quantities specified in Paragraph 1 of the contract were keyed to Circle G.'s plan to complete a washing plant in the summer of 1977. Once a washing plant was in operation, a more consistent product could be produced and sales, especially long-term contracts, would be more readily available. Allowing some leeway as to the time of completion the contract contemplated increased production upon completion of the plant. Schaffer was instrumental in obtaining commitments from R.P.R. to assist in the financing of the washing plant. He therefore extracted the condition found in Paragraph 1 that one-third of all coal mined by Circle G. would be from the Hemisphere tract, thereby ensuring that Circle G. would not bypass the tract to mine others' coal once the washing plant was in operation.
12. Coal from the Yates area was not of such quality that it could be mined and then stored until sales were made. If stockpiled for any appreciable length of time, the coal was likely to ignite when rain caused the coal and organic matter to react. For this reason, the practice in this area was to not mine the coal until sales were made.
13. Circle G. never commenced mining pursuant to the contract. Likewise, it never made any sales of coal from the Hemisphere tract, or attempted to do so. In fact, no coal off this tract has been sold to date. St. James Associates made only minimal investigation into the possibilities of sales, and never obtained any firm commitments. These attempts were made by Terry McCracken, as agent of St. James Associates, in early 1977.
14. McCracken made several visits to the Yates area during this time to check on the progress at the Hemisphere tract. On his first few visits he inquired as to why mining had not commenced and was told by Floyd Guilford that no mining was being attempted due to the weather; he accepted this explanation. He also noticed on these visits, however, that Circle G. was in need of additional equipment before mining could adequately commence.
15. McCracken reported back to Schaffer, who became concerned over the apparent lack of progress. In mid-May, 1977, he set up a meeting in Yates with the Guilfords. This meeting was held on June 1, 1977. At this meeting, Schaffer inquired as to what was needed to be done in order that mining might commence, and what assistance he could provide. At that time, he obligated St. James Associates to purchase a $78,000.00 front-loader for Circle G., and gave Circle G. a $400.00 check to obtain a mining permit. St. James Associates has excused any non-performance by Circle G. up to this time.
16. Since mid-May, 1977 Circle G. had been attempting the sale of its assets. Schaffer was not aware of this at the time of the aforementioned June 1 meeting. Apparently, Circle G. had been having serious problems due to an inability to market coal. In mid-May, Circle G. contacted Orlando Schiappa, an Ohio businessman. Schiappa has interests in a wide variety of holdings, including coal mining leases in the Yates area. Schiappa is principal officer and shareholder of American Industries and Resources ("American"), a holding company which holds interests in companies primarily engaged in coal mining. American is eighty per cent owner of a company called Amitalsa, which in turn is one hundred per cent owner of S & S Realty Company ("S&S"), defendant herein. American is also one hundred per cent owner of Missouri Mining, Inc., also a defendant herein. S&S and Missouri Mining are Missouri corporations with their principal place of business in that state.
17. The Guilfords approached Schiappa after another attempt to sell Circle G. was unsuccessful. They knew he had coal mining leases in the Yates area. The Guilfords originally sought one and a quarter million dollars for their equipment, land and leases, but Schiappa considered this price entirely too high. Schiappa saw little value in Circle G.'s assets, and was interested primarily in obtaining Circle G.'s leases and Floyd *346 Guilford's expertise in obtaining additional coal leases in the Yates area.
18. In discussing the terms of a possible sale, the Guilfords pointed out their responsibilities under the contract with St. James Associates. Schiappa and his assistant, John Whiteley, examined the contract and were not pleased with it. They assured the Guilfords, however, that they could live with it and would assume responsibility for it. The Guilfords would not have gone through with the transaction had such assurances not been given.
19. In late June, prior to finalization of the transaction, Whiteley contacted Schaffer to inform him of the prospective purchase of Circle G.'s assets. Whiteley was assigned the task by Schiappa of attempting to renegotiate the coal mining agreement then in existence between St. James Associates and Circle G. After this contact by Whiteley, Schaffer had no further dealings or contact with Circle G. He cancelled the purchase of the front-loader, and did not follow up on the funds he gave Circle G. to obtain a mining permit.
20. An agreement to purchase Circle G. was signed on or about July 15, 1977. Schiappa structured the sale such that the deal was made by S&S, determining that coal mining properties would help to round out S&S's portfolio. Up until this time, it is unclear which, if any, particular company the Guilfords were dealing with. In any event, it is clear that they were not dealing with Missouri Mining, as such, and Missouri Mining has no connection with the transactions herein except that it is controlled by Schiappa and run by Schiappa and Whiteley.
21. The agreement between Circle G. and S&S netted the Guilfords approximately $300,000.00 for their interests in Circle G.'s assets. Additionally, Floyd Guilford was given a two-year employment contract at $2,000.00 per month. The Guilfords and Ed Masters, an associate in Circle G., signed covenants not to compete with S&S in the Yates area.
22. S&S obtained Circle G.'s equipment, but more importantly, it received the coal leases then held by Circle G. Floyd Guilford was also instrumental in S&S's obtaining additional coal leases in the Yates area.
23. Had it not been for the sale of its assets, Circle G. would have been able to complete its obligations with St. James Associates. Though Circle G.'s equipment was in a state of disrepair, and some additional equipment was needed, Rochester and the other partners of R.P.R. had expressed an intention to provide Circle G. with any financial assistance that was necessary. They had provided financial assistance to Circle G. in the past. Schaffer expressed a similar willingness. With this assistance, Circle G. could have fulfilled its obligations; the deal with S&S, however, rendered Circle G. totally and irrevocably incapable of completing the contract.
24. Negotiations took place between Schaffer and Whiteley for approximately a year. The parties could never agree on the terms of a new coal mining agreement, however. S&S never made any attempt to assume the responsibilities of Circle G. under the coal mining agreement, nor was it asked by St. James Associates to do so.
25. The actions of Schiappa and Whiteley throughout the events in question were not taken in bad faith or with malice toward plaintiff. They were acting at all times in their own business interests, albeit with full knowledge of the possible consequences in relation to the coal mining agreement in question.
26. The market for coal in the Yates area in 1977 and 1978 was very poor. From the evidence presented, this Court can not conclude that Circle G. would have been able to sell the minimum quantities of coal called for in the coal mining agreement. In light of Circle G.'s difficulty in selling coal off other land, McCracken's inability to come up with any firm commitments for sales in early 1977, the total absence of sales off the Hemisphere tract up to the present and the generally poor market conditions described by the witnesses, it would be pure speculation and conjecture to so conclude. The fact that the Guilfords were *347 able to sell minimal quantities off other land in late 1976 and early 1977 does not alter this conclusion (in fact, they eventually sold Circle G.'s assets due to an inability to make sales).
27. No evidence was offered as to the marketing expenses which were reasonably to be expected in connection with the sales of the coal. Likewise, no evidence was offered as to the existence or non-existence of administrative or overhead expenses.

CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332. The parties are residents of different states and the amount in controversy exceeds ten thousand dollars.
Counts IV and V of plaintiff's first amended complaint seek to recover from all the defendants due to allegedly fraudulent statements made by Floyd and Phillip Guilford concerning the financial stability of Circle G. in order to induce plaintiff to enter into the coal mining agreement. These claims were not pursued at trial or in plaintiff's pre-trial or post-trial submissions. They will therefore be considered abandoned and judgment will be entered in defendants' favor thereon.
Defendants' initial argument is that the coal mining agreement is unenforceable due to lack of mutuality. The scheme envisioned by Schaffer was that Circle G. would obtain orders for the sale of the coal, and then mine the coal. After sales were completed and payment received by St. James Associates from the buyers, Circle G. would be paid for its efforts. Unfortunately, the agreement actually signed fails to embody these intentions.
There is no mention in the contract of any responsibility on the part of Circle G. to market the coal. Even accepting plaintiff's argument that such a commitment was in fact made by Circle G., the agreement would be oral. The Missouri Statute of Frauds, § 432.010 R.S.Mo. (1969), requires any contracts incapable of performance within a year to be in writing to be enforceable. The coal mining agreement had a minimum term of eighteen months. The sales obligation would necessarily be coextensive with the mining obligation, and therefore exceeded a year. The alleged responsibility of Circle G. to market the coal was therefore unenforceable.
There is, therefore, no enforceable obligation on the part of anyone to market the coal. With this in mind, Paragraph 21 of the agreement becomes very significant. Under that paragraph, Circle G. is only to mine coal at the specific request of St. James Associates. Such a request was not likely to be made until sales were assured. Though plaintiff argues that Paragraph 1 constitutes this "specific request", such an argument contradicts the clear language of the agreement, for Paragraph 21 specifically says "[a]nything herein to the contrary not withstanding." Paragraph 21 states that Circle G. would not be entitled to payment unless the mining had been conducted at St. James Associate's specific request, and nowhere in the agreement is plaintiff obligated to make such a request.
This interpretation may well not be what Schaffer intended when he drafted the agreement. In covering all his bases, however, he gave St. James Associates too much protection. Under the agreement as drafted, plaintiff is not obligated in any manner. By merely telling Circle G. not to mine, or by failing to specifically request production by Circle G., plaintiff is able to nullify the entire agreement.
In this situation, the Court must consider a fundamental rule of contract law  that a contract which depends for performance upon the will, wish or pleasure of one of the parties is unenforceable. Fullington v. Ozark Poultry Supply Co., 39 S.W.2d 780 (Mo.1931); Jump v. Manchester Data Sciences, Inc., 424 F.Supp. 442 (E.D. Mo.1976). This principle was utilized in Willard Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086 (1923), to hold unenforceable a contract similar to the agreement herein. In that case, the government contracted with plaintiff for plaintiff to deliver coal to the government *348 as requested, but the contract also stated that the government was not obligated to order any specific quantity. Due to this provision, the court held that the contract was unenforceable due to lack of consideration and mutuality. As stated, the agreement herein, similar to that in Willard, does not obligate St. James Associates to ever actually request Circle G. to mine.
Another analogous case is Bengimina v. Allen, 375 S.W.2d 199 (Mo.App.1964). In that case, the contract called for plaintiff to install vending machines in defendant's restaurant, giving plaintiff the exclusive right to do so. Revenues from the machines were to be split between the parties. The contract contained no provision, however, as to the type or number of machines which would be installed. Under these circumstances, the court held the contract unenforceable. Even though plaintiff was obligated to split what revenues were produced with defendant, since there was no obligation to provide machines from which revenues might arise, the revenue-splitting provision was without effect as a promise. Likewise, in the instant case, though plaintiff was obligated to pay Circle G. after sales of coal mined by Circle G. were completed, plaintiff was not obligated to request any action or take any steps which would lead to sales.
Plaintiff argues that it suffered a detriment sufficient to support this contract, Wells v. Hartford Accident and Indemnity Company, 459 S.W.2d 253 (Mo. banc 1970), due to the exclusive mining rights granted Circle G. The contract does not grant such rights, however. Plaintiff also argues that this agreement is analogous to a requirements contract, and therefore enforceable. In the absence of a provision granting exclusive rights to Circle G., however, this analogy is not of assistance to plaintiff. Propane Ind. Inc. v. General Motors Corp., 429 F.Supp. 214 (W.D.Mo.1977). Lastly, plaintiff argues that Schaffer's assistance in obtaining R.P.R.'s promise to provide additional financing constitutes sufficient consideration. This Court can not accept that argument. Any such promise was not acted upon by Circle G., and was likely not enforceable in any event. If anything, this was consideration flowing from R.P.R., not plaintiff.
The conclusion is therefore dictated that the coal mining agreement signed by plaintiff and Circle G. on October 27, 1976 is unenforceable. Circle G. may not, therefore, be held liable for breach thereof.
This unenforceability is irrelevant, however, to plaintiff's claims that S&S tortiously interfered with plaintiff's contractual and business relations with Circle G.[1]Casterline v. Stuerman, 588 S.W.2d 86 (Mo. App.1979). An unenforceable contract is not a necessary element of such a cause of action; all that is necessary is a business relationship or expectancy. Id.; Salomon v. Crown Life Ins. Co., 536 F.2d 1233 (8th Cir. 1976), cert. denied 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); Downey v. United Weather Proofing, Inc., 253 S.W.2d 976 (Mo.1953); Harber v. Ohio National Life Insurance Company, 390 F.Supp. 678 (E.D. Mo.1974), aff'd. 512 F.2d 170 (8th Cir. 1975).
The elements plaintiff must prove to recover from S&S due to tortious interference with contractual relations are set out in Salomon, supra at 1238:
(1) A contract or valid business relationship or expectancy (not necessarily a contract);
(2) Defendant's knowledge of the contract or relationship;
(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;
(4) The absence of justification; and
(5) Damages resulting from defendant's conduct.
See, also, Dependahl v. Falstaff Brewing Corp., 491 F.Supp. 1188, 1198 (E.D.Mo.1980).
Several of these elements are obviously met. First, though the contract between *349 the parties has been found unenforceable, there was clearly a business relationship between plaintiff and Circle G. Second, S&S has admitted knowledge of this relationship.
As to the third element enunciated in Salomon, the answer is not so easy, but this Court is convinced that this element is satisfied also. Defendant has argued, and this Court has found, that Circle G. would have performed its agreement had not it sold out to S&S. By selling out to S&S, and by signing covenants not to compete, Circle G. rendered itself incapable of performing the contract or continuing the business relationship. Laclede Power Co. v. Stillwell, 97 Mo.App. 258, 71 S.W. 380 (1902).
S&S claims that it can not be said to have "induced" the cessation of the business relationship, since the Guilfords approached Schiappa and not vice versa. This Court can not agree. The evidence showed that the Guilfords would not have sold out had Schiappa and Whiteley not assured them that they would take care of the coal mining agreement. Though the Guilfords desired to sell Circle G.'s assets, they were not inclined to breach the contract. They sought assurances that S&S would take care of the contract. By assuring them in this regard, Schiappa and Whiteley, on behalf of S&S, actively and affirmatively took steps to induce the breach. The two-part test enunciated in Tri-Continental Leasing v. Neidhardt, 540 S.W.2d 210 (Mo.App. 1976), is therefore satisfied herein.
This Court must also conclude that S&S was not justified in its actions. This case is significantly different from one in which the defendant merely purchased the assets of a willing seller. Here, the alleged tortfeasor assured the seller that it would assume the seller's liabilities. In this regard, this case is strikingly similar to Downey, supra. In that case, the defendant agreed to indemnify plaintiff's customers for any liability arising from their breach of their contracts with plaintiff. The court found such conduct unjustified. Likewise, defendant's actions herein were not justified. The actions on the part of defendant were not an attempt to protect an existing economic interest, and S&S had no financial interest in the affairs of Circle G. Cf. Pillow v. General American Life Ins. Co., 564 S.W.2d 276 (Mo.App.1978). Defendant sought only to further its own economic interests. Though not done with malice or in bad faith, as those terms are generally understood, the actions of defendant S&S were clearly taken with full knowledge of the possible consequences. Under these circumstances, defendant's actions were not justified. Id.; Smith v. Standard Oil, Div. of Amoco Oil Co., 567 S.W.2d 412 (Mo.App. 1978).
The last element of plaintiff's proof is showing acertainable damages resulting from defendant's actions. This element has not been satisfied herein. In order to recover lost profits, plaintiff must produce evidence that affords a sufficient basis for estimating their amount with reasonable certainty. Vigano v. Wylain, Inc., 633 F.2d 522 (8th Cir. 1980); Red-E-Gas Company v. Meadows, 360 S.W.2d 236 (Mo.App.1962).
[P]roof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of net profits during the previous period, is indispensable. Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo.1968).
See, also, Rich v. Eastman Kodak Company, 583 F.2d 435, 437 (8th Cir. 1978).
Of course, there is no such proof in this case, as plaintiff did not conduct any business either before or after defendant's actions. This Court simply can not accept plaintiff's attempt to quantify its damages  the figures are purely speculative and conjectural. Rich, id. Plaintiff's claims that the coal could have been sold are not based on any evidence and, in fact, are contrary to the facts herein. There is no proof to support the sales price asserted by plaintiff. Likewise there is no proof of the existence or non-existence of expenses which would be incurred. Under these circumstances, plaintiff has proved no damages. Since no actual damages were proved, plaintiff is likewise not entitled to punitive damages. Coonis v. Rogers, 429 *350 S.W.2d 709 (Mo.1968); Longmore v. Merwin, 585 S.W.2d 545 (Mo.App.1979). In any event, the evidence herein clearly would not justify the imposition of punitive damages. Judgment will be entered in favor of defendant S&S due to this failure to prove actual damages.
NOTES
[1] This claim is also made against Missouri Mining. In light of this Court's finding that Missouri Mining was not involved in the transactions in question, judgment will be entered in its favor.